# COURT OF ERRORS AND APPEALS.

## JANUARY TERM, 1846.

---

ASHER WILLIAMSON, APPELLANT, AND WILLIAM H. JOHNSON AND JOHN T. NEELY, ADMINISTRATORS OF BENJAMIN JOHNSON, RESPONDENTS.

1. An executor, with power to sell lands, exposed the land for sale at public vendue, on the 11th March, 1789, and no person bidding what he thought a sufficient price, requested his son to bid for it, and he, accordingly, bid $5.25 per acre. The executor postponed the sale on that bid, and gave notice that if any person would come forward and give more, he would sell the land to the person offering the best price, and that if no person offered a better price within a reasonable time, he would sell the same for the sum so bid by his son. No subsequent day was fixed upon for further biddings. On the 9th of August, 1792, the executor conveyed the land to his son, at the sum so bid by him, and the son, on the next day, re-conveyed the land to his father, the executor. No consideration passed, nor any security for any consideration, on either conveyance. The conveyances were set aside as fraudulent; and it was ordered that the land be sold under the direction of a master, and that the proceeds be brought into court.

2. The land was sold in 1812, under the direction of a master, and the proceeds brought into court. It was then ordered that the proceeds be paid to the executor, on his giving bond with surety, conditioned for the performance of the trust reposed in him by the will, (by which the proceeds were to be equally divided among the five sons of the testator, of whom the executor was one.) The executor, after receiving the proceeds, died, and administration of his personal estate was granted. In 1820, one of the five sons died, and the administrator of his personal estate caused a suit to be prosecuted against the surety on the said bond, to recover the share of the said deceased son; and in February, 1822, recovered final judgment for $2202.46.

Pending the said suit, by deed dated June 5th, 1821, the surety, with his wife, conveyed his real estate to his son and daughter ; the condition expressed in the deed being $10,000 ; the deed containing full covenants. This deed was acknowledged September 29th, 1821, and recorded October 1st, 1821. Execution was issued on the said judgment, and in May, 1823, all the right, title, and interest of the said surety in the real estate he had so conveyed, was sold by the sheriff on the said judgment against the surety, and the surety's said son and daughter bid $3000 for the same, and it was struck off to them. The money was paid to the sheriff by them, or one of them ; and the sheriff paid thereout, to the administrator of the said deceased son, the full fifth for which the said judgment had been obtained.

3. In March, 1824, the administrator of the executor and the said surety filed a bill of review, alleging errors in the decree setting aside the deed made by the executor in August, 1792 ; and setting up, on the part of the surety, that the executor had paid to the said deceased son, in April, 1792, a sum equal to a fifth part of the sum at which the land had been struck off by the executor to his son, in March, 1789, and had obtained the acquittance and discharge of the said deceased son for his share in full ; and praying divers matters on the part of the said administrator of the executor ; and praying, on the part of the surety, that the said judgment against him be set aside, and that the administrator of the said deceased son might repay to the said surety all moneys received by him over and above what should have been received by him for the share of the said deceased son.

4. To this bill a plea and demurrer were filed, which were allowed, on the 15th October, 1827 ; and an order was then made, giving leave to amend the said bill by striking out the name of the administrator of the executor as complainant, and the names of all the defendants except that of the administrator of the deceased son, and so much of the said bill as seeks a review of the said decree, so as to confine the object of the bill to the relief sought by the said surety against the said judgment and execution obtained against him on the said bond. On the 28th January, 1828, the surety filed his bill confining the relief he sought as directed in the said order. In October, 1843, upon the report of a master, (to whom the matter had been referred by an interlocutory decree,) stating that, on the 2d April, 1792, the executor had paid the said deceased son $350.66, and that the excess of the judgment against the. surety over the amount due at that time on the share of the said deceased son, with the interest on such excess, amounted to $2256, a final decree was made by the Chancellor for that sum, against Asher Williamson ; (he was the administrator of the deceased son ;) and that execution issue therefor against the goods and chattels, lands and tenements, of the said Asher Williamson.

5. The decree was affirmed.

6. What proof held satisfactory of the existence, genuineness, and loss of a receipt or acquittance from the deceased son.

7. On the discovery, after a judgment against a surety, of a receipt dated in 1792, of which the surety had heard before the judgment was obtained, but which could not then be found ; on bill filed by the surety, in 1824, after the judgment had been paid, it was decreed that the plaintiff in the

judgment at law repay to the surety the excess of the judgment over what it should have been after deducting the amount of the receipt, with interest thereon from the date thereof, with interest on such excess from the date of the judgment.

William Williamson died in 1765, seized and possessed of a farm containing two hundred and ninety acres, leaving a will, dated June 20th, 1764, by which, after bequeathing a legacy of £33 to his wife, he ordered that she should have command of his plantation, household goods, stock of creatures and farming utensils during her widowhood ; and that when she should marry or die, the executors of his will should take into their possession all his lands and personal property, and make sale thereof; and that out of the moneys thence arising, his executors should pay to his two daughters, Margaret Larue and Micha Williamson, £50 each; and that all the remainder should be equally divided among his sons, except that his son Abraham should have £100 more than either of his other sons ; and appointed his sons, Cornelius Williamson and Samuel Williamson, executors of his will.

The testator left his widow and five sons, Cornelius, Samuel, John, William and Abraham, and his said two daughters.

Cornelius refused to prove the will ; Samuel, on the 16th June, 1774, proved the will.

Samuel, on the 11th March, 1789, after advertising, &c., exposed the said farm for sale at public vendue, and no person bidding what he thought a sufficient price, he requested his son, Cornelius Williamson, Jr., to bid for the same, and he, accordingly, bid therefor 42 shillings per acre.

Samuel did not strike it off at that time, but postponed the sale on that bid, and gave notice that if any person would come forward and give more for the said lands, he would sell the same to the purchaser offering the best price, and that if no person offered a better price in a reasonable time, he would sell the same for the sum so bid by the said Cornelius Williamson, Jr., his son.

No person having offered a higher price, Samuel, on the 9th August, 1792, conveyed the said farm to his said son, for the said sum of forty-two shillings an acre so bid by him ; and the said Cornelius, Jr., on the next day, reconveyed the said

farm to the said Samuel. No consideration passed, nor any security for any consideration, on either conveyance.

Cornelius, son of the said testator, died in 1807, leaving a will, whereby, after making sundry other devises and bequests he gave and devised the residue of his estate, real and personal to his children, William, Cornelius, Asher, Joseph, Bernice, wif of Jacob Hoppock, Patience Williamson and Micha Williamson; and appointed his sons, William, Cornelius and Asher, executors of his will; and left his said children mentioned in his will all living.

On the 20th December, 1809, the children of Cornelius exhibited their bill in chancery, setting forth, &c., &c.; and praying that the deed upon the said sale, made by the said Samuel Williamson, as executor of the will of the testator, William Williamson, the elder, might be declared void; that the power of sale under the said will might be executed under the sanction and decree of the Court of Chancery, and the money thence arising be brought into court and distributed according to the said will; and that the said Samuel might account with the said complainants for the rents, issues and profits of the farm, and pay to the complainants their proportion, &c.

On the 10th July, 1810, the said Samuel filed his answer to the said bill.

A replication was filed and witnesses were examined.

On the 21st September, 1811, Joseph Bloomfield, Chancellor, made an interlocutory decree in the said cause, by which, among other things, he ordered, adjudged and decreed,

1. That the said pretended sale by the said Samuel Williamson to the said Cornelius Williamson, Jr., be, and the same is, thereby declared to be void, fraudulent and of no effect.

2. That the deeds of August 9th, 1792, from the said Samuel Williamson to his son, Cornelius Williamson, Jr., and from the said Cornelius Williamson, Jr., to the said Samuel are, and the same are thereby declared, void and fraudulent, and are altogether set aside and vacated.

3. That the said Samuel Williamson, executor of William Williamson, deceased, execute the trust reposed in him, by the sale of the real estate of the said testator. And, forasmuch as the said Samuel Williamson has been guilty of fraud

in the premises it is ordered that he make the sale under the direction of James Linn, esquire, one of the masters of the court, who is hereby authorized to direct the said Samuel Williamson in all matters in relation to the advertising and selling the said premises, and the conditions on which the sale shall be made, to the best advantage of those concerned, and that the said master make report to the court when the sale shall have been made, and that the moneys arising therefrom, or the securities taken for the same, be brought into court.

4. That it be also referred to the said master to take an account of the rents, issues and profits of the said real estate from the time the said Samuel Williamson has had possession thereof, to wit, the 11th of March, 1789, until the time of the taking of the said account, and also of substantial and permanent improvements made by the said Samuel Williamson thereon, and that the master make report, &c. And all further questions and equity arising in the cause are reserved until the coming in of the master's report; particularly the questions of costs and the distribution of the proceeds.

In pursuance of the said decree, the master, on or about the 24th October, 1812, reported to the court, among other things, that the rents from the time the said Samuel Williamson had had possession, twenty-three years, amounted to $2760, and that $505 should be credited for improvements put on the farm by the said Samuel.

Exceptions having been taken to the said report, and submitted to the court, Aaron Ogden, Chancellor, in March, 1813, made an order confirming the said report.

In pursuance of the said interlocutory decree made on the 21st September, 1811, the said Samuel Williamson, as executor of the will of the said William Williamson, deceased, sold the said farm, under the direction of the said master, for $7923.31; and the moneys thence arising, or the securities taken therefor, being brought into court, the said cause again came on to be heard before Chancellor Ogden, in September, 1813, upon the equity reserved and all questions thereon, and on the 22d October, 1813, it was by the said Chancellor ordered, adjudged and decreed that James Linn, esquire, the clerk of the court, should, without any further account, pay, from the

moneys in his hands arising from the sale of the said premises, to the executors or personal representatives of the said Cornelius Williamson, deceased, the one-fifth of the sum $10,178.21, being the amount of the proceeds of the said sale and net rents of the said premises, after making the following deductions and allowances, to wit:

| | | |
|---|---|---|
| From the whole proceeds of said sales and net rents........ ........ ......... ......... | $10,178 21 | |
| Deduct, 1st. £100 devised by the testator, William Williamson, deceased, to his two daughters; £100 devised by the said testator to his son Abraham, with interest from 1792 to 1812, being twenty years; all which amount to.......... ......... .........$1,280 00 | | |
| 2d. The account of James Linn, Esq., for superintending the making the sales aforesaid ...... ...... ........ .......... ...... 173 80 | | |
| | | 1,453 80 |
| | $8,724 41 | |
| Divide the remaining sum by five, which will give the one-fifth part, or share of the said Cornelius Williamson, deceased, amounting to ...... ......... ...... | 1,744 88 | |
| 3d. From which deduct the proportion of the said Cornelius Williamson, deceased, of the sale first made by the said Samuel Williamson, which proportion he must be presumed to have paid, according to his answer, or settled in some other way, after a lapse of 20 years; which, with 20 years' interest, amounts to | 523 33 | |
| Net amount due to the personal representatives of Cornelius Williamson...... ......... .............. .......... | $1,221 55 | |

Which sum of $1221.55 was ordered, adjudged and decreed to be paid by the said James Linn, out of the moneys in his hands as aforesaid, to the executors or personal representatives of the said Cornelius Williamson, deceased, as assets of his estate. And it was further ordered that the said James Linn do pay, from the moneys in his hands as aforesaid, the costs of the said complainants to be taxed, and that he be allowed to retain in his hands $173.80 for his charges in superintending the said sales.

And it was further ordered, adjudged and decreed that the said James Linn do pay over to the said defendant, Samuel Williamson, executor as aforesaid, the residue of the moneys arising from the said sales, upon security to be given by bond to the Governor and Chancellor of the state for the time being, in the penal sum of $5000, conditioned for the faithful performance of the trust reposed in him by the will of the said testator, William Williamson, deceased, to be signed by him and one surety, to be approved by the said James Linn, who should make report of his doings therein and file the said bond on the files of the court.

On a petition for a re-hearing in the said cause, a re-hearing was ordered, and the cause came on to be re-heard on the 1st June, 1814; and, on the 11th of that month, it was, by William S. Pennington, Chancellor, ordered, adjudged and decreed, among other things, that the decree made by the late Chancellor, on the hearing of the said cause on the equity reserved, on the 22d of October, 1813, be altered, amended and rectified by striking therefrom the item whereby the sum of $523.33 was directed to be deducted from the sum of $1744.88; and that the said decree be in all other parts ratified and confirmed.

Of the moneys arising from the sale, so ordered to be brought into court, the said Linn, clerk of said court, acknowledged the receipt of $6924.47.

Of the said sum, Linn paid to Asher Williamson, one of the executors of the said Cornelius Williamson, deceased, pursuant to the decree...................... $1,744 88

And paid the complainant's costs...... ........... ...... 202 23

And, after retaining his fees as master............ ..... 173 80

And the fees allowed to him by law on the money paid into court ......... ...... ......... ...... ............... 69 24

$2,190 15

He paid, on the 25th June, 1814, to the said Samuel Williamson, executor of William Williamson, deceased, the sum of $4734.32, the balance of the said sum of $6924.47.

Whereupon the said Samuel Williamson, together with Benjamin Johnson as his surety approved by the said James Linn, executed and delivered a bond, dated June 25th, 1814, to William S. Pennington, Governor and Chancellor of the State of

New Jersey, in the penal sum of $5000, conditioned that the said Samuel Williamson should faithfully perform the trust reposed in him by the will of the said William Williamson, deceased, which bond was filed in the office of the clerk of the Court of Chancery.

On the 20th December, 1820, William Williamson, son of the testator, being dead, Asher Williamson applied for and obtained letters of administration of the estate of the said William Williamson the younger, deceased ; and afterwards, as such administrator, caused an action to be commenced in the Supreme Court, in the name of William S. Pennington, late Governor and Chancellor, for the benefit of the said Asher as such administrator, against Benjamin Johnson, as survivor of said Samuel Williamson, deceased, who was then dead, for $5000, and declared upon said bond given by said Samuel Williamson and Benjamin Johnson to the said William S. Pennington, Governor and Chancellor as aforesaid, in pursuance of the said decree of October 22d, 1813 ; and Johnson not having appeared or pleaded in said cause, a judgment by default was entered against him, in November, 1821, whereupon a writ of inquiry of damages was awarded, which was executed on the 25th February, 1822, and an inquisition finding $2202.46 damages besides costs, made and returned with the said writ ; and on the 27th of that month, final judgment was entered in the suit, against Johnson, for the penal sum of $5000 debt, and $49.30 costs ; and the said Asher caused execution to be issued, in the name of the plaintiff in said cause, against the goods and lands of the said Benjamin Johnson, endorsed to levy the damages so assessed as aforesaid and costs, with interest from February 26th, 1822, which execution was delivered to Edward Welsted, sheriff of Hunterdon, on the 15th March, 1822, by virtue of which the said sheriff levied on three tracts of land ; the first containing 170 acres, more or less, whereon Johnson resided ; the second containing 218 acres, more or less, and the third being a tavern-house and lot of two acres at New Market.

Pending the said suit, by deed dated June 5th, 1821, Johnson, with his wife, conveyed all the said three tracts of land to William H. Johnson and Clarissa Johnson, his son and daughter ; the consideration expressed in the deed being $10,000, the deed

containing full covenants. This deed was acknowledged September 21st, 1821, and recorded October 1st, 1821.

In May, 1823, the sheriff, under the said execution and levy, exposed the said three tracts of land for sale. He first tried to sell them separately, but no person appearing willing to bid for either of them in that way, he exposed them for sale all together, at one bidding, and the said William H. Johnson, for himself and his said sister, bid $3000, and the lands were struck off to them.

The money was paid to the sheriff by them, or one of them, and the sheriff, out of the money, paid to Asher Williamson as administrator of the deceased son, William Williamson, the amount of the share of the said deceased son, for which the said judgment had been obtained.

Samuel Williamson, the executor, had died in 1821, and administration of his personal estate had been granted to Abraham R. Sutphen. On the 6th of March, 1824, Sutphen, as administrator of the said executor, and Johnson filed a bill of review, assigning errors in the said decree made by Chancellor Bloomfield, in 1811, and in the said decree made by Chancellor Ogden, in 1813, and in the said decree made by Chancellor William S. Pennington, in 1814, and praying that the said decrees might be reversed or corrected. Asher Williamson, Cornelius Williamson, and William Williamson were the defendants in this bill.

This bill also prayed, upon certain allegations made therein, that the executors of Cornelius Williamson, deceased, might come to an account with the said Sutphen, administrator of the said Samuel Williamson, touching the moneys received by them from, and to the use of the said Samuel, and might refund all moneys by them received, over and above what was justly due and ought to have been received by them, and touching other matters therein stated, and that the said judgment at law in favor of William S. Pennington, late governor, &c., to the use of the said Asher, as administrator of William Williamson, deceased, against Johnson, predicated upon the said decrees and the bond aforesaid, might be set aside, and that the said Asher Williamson might account touching the moneys so collected and received by him as administrator of

William Williamson, the younger, deceased, and might repay all moneys so by him received, over and above what ought to have been demanded and received by him in the said action on the said bond against the said Johnson.

On the 13th of October, 1824, the defendants filed their plea and demurrer to the said bill. For plea, they say that the said cause in the bill mentioned, in which William Williamson, Cornelius Williamson, Asher Williamson, Joseph Williamson, Hoppock and wife, Patience and Micha Williamson were complainants, and the said Samuel Williamson, defendant, came on to be heard in September, 1811, before Chancellor Bloomfield, when the said Chancellor made his decretal order as follows (setting out, at length, the said decretal order.) That James Linn, the master named in the said decretal order, on the 24th of October, 1812, made his report as follows (setting out the master's report at length.)

That the said report was confirmed by Chancellor Ogden, in March, 1813. That the said master, under whose direction the said real estate was sold, made his report of the said sale as follows (setting out the master's report of the sale.)

That the said cause came on for final hearing on the equities reserved, in September, 1813, before Chancellor Ogden, who, on the 22d of October, 1813, made his final decree as follows (setting out the said final decree at length.)

That the complainants, being dissatisfied with the said decree on the equity reserved, filed their petition for a re-hearing of the cause, on the matters in the said petition set forth, and a re-hearing of the cause having been ordered, the same came on to be re-heard, on the said petition, before Chancellor William S. Pennington, in June, 1814, who made his decree on the said re-hearing as follows (setting forth the decree at length.) And the defendants aver that the said decretal orders and final decree were duly signed by the Chancellor, on the —— day of ———, 18—, and entered, enrolled, and recorded according to law.

And these defendants, Asher Williamson, William Williamson, and Cornelius Williamson, do demur on the law of the said bill of review of the said complainants, and for causes of demurrer show that the said decree is free from the errors complained of.

Williamson v. Adm'rs of Johnson.

That the said bill of review was filed without leave of the court first obtained; without any affidavits verifying the truth of the facts contained therein, and without the complainants having made any deposit to answer the costs these defendants would incur thereupon.

That the said bill does not set out the decree complained of in such manner as the same should have been set out, but a long allegation of facts, some of which are charged to have existed before, and others to have happened since the making of the said decree, which are irrelevant and unfit to be introduced into a bill of review.

That Benjamin Johnson, one of the complainants, is a stranger to the decree complained of, being neither party nor privy thereto.

That the bill is multifarious; several distinct matters having no connection with each other, and affecting the two complainants separately and distinctly, were inserted in the bill.

That Joseph Williamson, Patience Williamson and Micha Williamson, parties complainant to the decree sought to be reversed, and interested therein, are not made parties to the said bill.

Wherefore, and for divers other errors and imperfections appearing on the said bill, these defendants do demur, and pray that they may not be compelled further to answer the said bill, that the enrollment of the said decree may not be opened; and that the said bill of review may be dismissed, with costs.

*R. Stockton,* of counsel with the defendants.

The Chancellor having decided that the plea and demurrer be allowed, it was, on the 15th October, 1827, ordered by the Chancellor that leave be given to amend the bill of complaint by striking out the name of Abraham R. Sutphen, as a complainant, and William Williamson and Cornelius Williamson, as defendants, and also so much of the said bill as seeks a review of the decree between William Williamson and others, complainants, and Samuel Williamson, defendant, in the said bill mentioned and set forth, and all other irrelevant matter in the said bill contained; so as to confine the object of the bill to the relief of Benjamin Johnson against a judgment and execution in the bill mentioned to have been obtained against him

in the Supreme Court, by the said Asher Williamson, defendant in this cause, upon the said complainant paying to the defendant's solicitor the costs of the plea, demurrer and argument in this case, and amending the defendant's copy of the bill gratis.

On the 9th January, 1828, Benjamin Johnson filed his bill. The bill is entirely re-drawn, under the leave so given, and is in form an original bill, by Benjamin Johnson, complainant, against Asher Williamson, defendant.

The bill then states the will of William Williamson the elder, and the probate thereof by Samuel Williamson, (Cornelius, the other executor named therein, **declining to act,**) **the** exposing of the farm for sale by Samuel, in 1789, the striking it off to his son, the deed from Samuel to his said son, in August, 1792, and the reconveyance on the same day by his said son to him; alleges that on the 2d April, 1792, Samuel, the executor, paid to William Williamson, a son and devisee of his father, William Williamson, the testator, his share of the sum for which said farm had been so struck off by the executor to his son, and that the said William, the younger, thereupon executed to the said executor an acquittance and discharge in full for his share, dated April 2d, 1792; states the death of Cornelius Williamson, son of the testator, leaving a will devising his estate to his children, viz., William, Cornelius, Asher, and Joseph Williamson, Bernice, wife of Jacob Hoppock, Patience Williamson and Micha Williamson, and appointing his sons, Cornelius Williamson, Asher Williamson and William Williamson executors of his will; that these children, devisees and executors of Cornelius Williamson, deceased, on the 20th December, 1809, filed their bill against the said Samuel Williamson, executor of the will of William Williamson, the elder, praying that the said deeds from him to his said son and from his said son to him be set aside, and that the said real estate might be sold under the direction of the court, and that Samuel might account for the rents and profits thereof; setting out the answer and proceedings on that bill, and the decrees hereinbefore stated  stating that Samuel Williamson, the executor, died about April 1st, 1821, intestate, and leaving very little property, and that no person administered on his estate until 1823, after the judgment against Johnson, when administration was grant-

ed to Abraham R. Sutphen ; that William Williamson, son of
William Williamson, the testator, having removed to the west-
ern country, where he died, Asher Williamson, on the 20th
December, 1820, obtained letters of administration of the per-
sonal estate of said William Williamson the younger, deceased,
and brought suit against the complainant Johnson on the said
bond in which he was surety, as aforesaid, for the said Samuel
as executor as aforesaid, in the name of William S. Pennington,
Governor and Chancellor, for the use of the said Asher as ad-
ministrator as aforesaid ; stating the judgment obtained against
this complainant in that suit ; stating that the sheriff, by virtue
of an execution issued on that judgment, advertised the property
and estate of him, the complainant, Benjamin Johnson, on the
2d September, 1822 ; and that the said Asher Williamson bid-
ding for the homestead farm of 170 acres the sum of $1310, for
the tavern house and lot $405, and for another farm of 218
acres $600, the same were struck off to him for the sums so bid,
and the sheriff executed a deed to the said Asher, and delivered
it to him ; that shortly afterwards a defect was discovered in the
advertisement of the said property for sale, and the said sheriff,
by the direction of the said Asher, again advertised the said
property for sale, and, on the 14th May, 1823, again exposed
the same for sale, and William H. Johnson and Clarissa John-
son bidding $3000 for the said premises all together, the same
were struck off to them for that price, and the sheriff conveyed
it to them ; and that, out of the purchase money received of the
said William and Clarissa, the sheriff paid to the said Asher
Williamson, as administrator of the said William Williamson
the younger, deceased, the whole amount of the debt, interest
and costs on the said judgment and execution against the com-
plainant, Benjamin Johnson.

The bill states that, at the commencement of the said suit
against the complainant, and until after the judgment and exe-
cution and both the said sales had taken place and the said
execution was paid off and satisfied, administration of the estate
of the said Samuel Williamson had not been granted, and there
was no personal representative of the said Samuel to investigate
the state of his affairs, or having the custody or knowledge of
his papers. That the complainant was ignorant of the claim of

the said Asher Williamson, as administrator of said William Williamson the younger, deceased, against the said Samuel Williamson; that he had no access to, nor did he know where to find the papers of the said Samuel in relation to the said claim, or any documents or vouchers to enable him to contest or make any defence against the same. That he had heard that the said Samuel, in his lifetime, and in the lifetime of the said William Williamson the younger, had made a payment to the said William Williamson the younger, for or on account of his share of the estate of the said William Williamson the elder, deceased, and that there had been some receipt, acquittance or discharge for the same in the hands of the said Samuel Williamson, deceased, in his lifetime, but whether the same were yet in existence, or where or in whose custody the same was to be found, or by whom such payments could be proved, the complainant knew not. But he had also heard that the payment of the money and the existence of the receipt and discharge therefor were well known to the said Asher Williamson, who had repeatedly admitted the fact that a payment had been made, and after the commencement of the suit against this complainant, and before the execution of the writ of inquiry therein, he also admitted that there was only a balance of $1000 or $1200 due to the said William Williamson the younger, deceased, on his share, which was all he expected to recover of this complainant. That the complainant expected that the said Asher Williamson had made a correct calculation of the sum due after deducting the payment, and intended to claim no more; and not being able to deny his bond, and not being in possession of any evidence, or knowing where to obtain it, to prove the said payment, or ascertain the amount, and relying on the declaration of the said Asher that he only claimed the balance due after deducting said payment, the complainant did not undertake to contest the justice or amount of his claim.

That the said Asher Williamson, after the decease of the said Samuel Williamson, having gone to the house of Abraham Terhune, where the said Samuel died, and examined his papers remaining there, and finding that no such acquittance or discharge was among them, and supposing the same to be lost, and that no proof of such payment could be produced, fraudu-

lently and deceitfully denied that any payment had been made, and did falsely and fraudulently conceal the same from the knowledge of the jurors of the said inquest, and did then and there exhibit, or cause to be exhibited, a claim for the whole amount of the share of the said William Williamson the younger, deceased, of the moneys arising from the second sale and net rents of the said farm, upon the footing of the before-mentioned decree of October, 1813, with the interest thereon, without allowing any credit for the said payment, the whole amount of which said claim was accordingly assessed and found for the plaintiff by the said inquest, he, the said Asher, well knowing, at the time, that such payment had been made and acquittance given, that the same ought to be credited, and that the sum so claimed and found was not due and owing by the said Samuel Williamson, as executor as aforesaid, to the said Asher, as administrator of the said William Williamson the younger, deceased; that the complainant, not being present at the said inquest, had no knowledge of the sum thus fraudulently claimed, and which was found by the said inquest, until after judgment was entered and execution issued thereon; that he was deceived and surprised by the conduct of the said Asher in the premises.

That after the appointment of the said Abraham R. Sutphen as administrator of the said Samuel Williamson, the complainant applied to him; that they searched among the papers left by the said Samuel at the place where he died, for the said receipt or discharge, but that the same could not be found; that they searched at other places where they supposed it might possibly be, but could not find the same until the 10th day of June, 1823, where they first discovered the same among some papers in possession of Peter I. Clark, esquire, into whose hands they had accidentally come after the decease of George C. Maxwell, esquire, who had had them in his hands in the lifetime of the said Samuel.

That the said receipt, acquittance, and discharge being dated the 2d day of April, 1792, given by the said William Williamson, the son and one of the devisees of the said William Williamson, deceased, to the said Samuel Williamson, deceased, for £131 10s., in full of his legacy or share of the moneys arising

from the first sale of the farm of the said testator, hath since been mislaid or lost, so that the complainant is not able to produce the same in court, but hopes to be able to make satisfactory proof thereof.

That the said Asher Williamson, administrator as aforesaid, obtained the said judgment and execution against the complainant for a much larger sum than was actually due, by such fraud, deceit, concealment, and surprise upon the complainant, at a time when the complainant had it not in his power to prove the said payment by the production of said receipt, or to ascertain the amount thereof, and, having since discovered the said receipt, the complainant had well hoped that the said Asher Williamson would have come to an account and settlement with the complainant touching and concerning the moneys so recovered and received by him, as administrator of the said William Williamson the younger, deceased, of the complainant, and would have refunded to the complainant all the moneys so recovered, over and above what was justly due and owing, and ought to have been demanded and received by him on that account.

The bill prays that the said judgment at law, at the suit of the said William S. Pennington, late Governor and Chancellor, to the use of the said Asher Williamson, as adminstrator of the said William Williamson the younger, deceased, against the complainant, may be set aside and declared null and void, as obtained by fraud, surprise, and mistake, or that, notwithstanding such judgment, the said Asher may come to an account with the complainant touching and concerning the moneys collected and received by the said Asher, as aforesaid, upon such judgment, and that the said Asher Williamson may be decreed to refund and repay to the complainant all the moneys so recovered and received, over and above what was actually due and owing, and ought to have been recovered in said action for the share of the said William Williamson the younger, deceased, in the proceeds of the second sale and net rents of the said farm, after deducting the sum so paid by the said Samuel Williamson to the said William Williamson the younger, deceased, in his lifetime, for his share of the moneys arising from the first sale.

Subpœna is prayed, to be directed to the said Asher William-
son.

On the 12th July, 1828, the following order was entered:
" Upon opening the matter to the court this day by Nathaniel
Saxton, solicitor and of counsel with the complainant, it ap-
pearing that process of subpœna to appear and answer had been
duly issued and served on the defendant in this case, by the
sheriff of the county of Hunterdon; and it being alleged that
a copy of the amended bill in this case had been duly served on
Richard Stockton, Esq., the late solicitor of the said defend-
ant; and that since the decease of the said Richard Stockton,
Esq., and previous to the last term of this court, the said
defendant had been duly warned to appoint another solicitor;
and it appearing that the said defendant hath neglected to file
any plea, answer or demurrer to the said bill, it is thereupon
ordered and directed by the Chancellor that the complainant do
produce documents, depositions and other evidence to substan-
tiate and prove the allegations in his bill, to the end that such
decree may be made against the said defendant as the Chancel-
lor shall think equitable and just."

On the 7th October, 1829, Peter Williamson, examined on
the part of the complainant, says—He is a son of Samuel Wil-
liamson, deceased, and is now in his 67th year; he recollects
William Williamson, who was his uncle, and the son of William
Williamson the elder; he recollects that his father, as the ex-
ecutor of William Williamson the elder, deceased, made sale
of a farm as the property of said deceased; the said sale took
place upwards of forty years ago; Cornelius Williamson, a
brother of the deponent, was the purchaser of the said farm;
the deed was not made and executed for the premises until
some time after the sale was made; witness lived at home with
his father when the sale was made, and thinks he did also
when the deed was made, or prepared, to Cornelius Williamson,
which was some time after the sale; witness went to a convey-
ancer, on the part of his father, to get the deed drawn for the
premises, to Cornelius Williamson; my uncle, William Wil-
liamson, lived at that time in Virginia; he was twice in the
county of Hunterdon, at my father's; once before and once af-
ter the sale was made to Cornelius Williamson; when he was

there before the sale, witness understood that his uncle wanted money from witness' father as executor of William Williamson, deceased, and he further understood that his father paid him some and took his note for it, but does not recollect being present at the payment of the money or the giving of the note; the second time uncle William came to Jersey, which was after the sale, he remained here a considerable time, and came for his share of the money arising from the sale of the farm; witness knows the fact, because he was present at the transactions between his father and uncle on this business; witness knows that his father, as executor as aforesaid, paid his uncle William what he supposed to be in full of his share, and his uncle gave a final receipt in full; witness saw the money paid; I drew the receipt and acquittance myself; the money was paid and the discharge given at the house of John Hull, who was the husband of my aunt Margaret, who was a daughter and one of the legatees of the said William Williamson the elder, deceased; the receipt or acquittance was signed by uncle William, sealed, and was witnessed by deponent and one Uriah Bonum; witness cannot recollect the precise amount of money that was paid, but understood that the note which his uncle William had before given to his father, was deducted from the amount of his share, and the balance paid to him in money.

At the time uncle William was paid his share, witness lived on the premises before mentioned; on the morning of the same day that uncle was paid, my father, as executor as aforesaid, at my house on the premises, paid my aunt Micha, another of the legatees, her specific legacy, and took her receipt; witness drew the receipt for aunt Micha, and saw it executed, and was also a witness to it; thinks that Uriah Bonum was a witness to it also; he was there.

From my house, on the same day, deponent, his father and uncle William and Uriah Bonum went to the house of John Hull, and there my father, as executor as aforesaid, paid the said John Hull and his wife their specific legacy, and took their receipt and acquittance under seal; witness drew the acquittance from John Hull and wife himself, and saw it executed, and signed his name, together with Uriah Bonum, as witness

to it. The paper now shown to witness, and marked Exhibit B on the part of the complainant, (*pro ut* the same,) witness says is the original receipt or acquittance executed by Hull and his wife, and witnessed by Bonum and deponent at that time; witness is satisfied that this receipt or acquittance was executed at the very day it bears date, and recollects making a correction in the last line but one of it, in the date, from the first to the second day of April, on the suggestion of his father that he had made a mistake in the day of the month.

At the same time and place, my father, as executor as aforesaid, paid my uncle William his share, and my uncle William executed a receipt or acquittance, under his hand and seal, which was witnessed by deponent and Uriah Bonum; cannot say which was paid first, uncle William or Hull and his wife; the receipt from my uncle William to my father as executor, was drawn by me, and was in the same form as the one from Hull and his wife, except that it was for a share instead of a specific legacy, and of the same date and executed the same day; Uriah Bonum, the other subscribing witness to those receipts, has been dead some years; witness recollects having seen the receipt or acquittance from his uncle William to his father in the possession of his father since that time.

Deponent has seen a man called Abraham Williamson, from the western country, who has been in New Jersey since the commencement of the cause; the said Abraham Williamson has been at different times at the house of this deponent, while he was in this state, and represented himself as the son of the said William Williamson, deponent's uncle; witness thinks the said Abraham is the son of his uncle William, from family resemblance, and also from the said Abraham reminding him of some circumstances that took place at the house of his uncle William a good many years ago, when deponent was there, and when the said Abraham was a little boy, and which the deponent recollected when reminded of them; in conversation with the said Abraham respecting the payment made by deponent's father, as executor as aforesaid, to uncle William, the said Abraham's father, and its having been recovered again from Benjamin Johnson, his father's security, by Asher Williamson, and Benjamin Johnson's claiming it back in this suit,

the said Abraham Williamson said that Asher Williamson was willing to pay it back to the children of Samuel Williamson, deponent's father, and that deponent was a fool if he did not go and get it, but that Asher did not want to pay it to Benjamin Johnson; deponent's brother, William Williamson, lives now and has lived for several years, in the State of Kentucky.

At the time of the payment made by my father, as executor as aforesaid, to uncle William, deponent knew the amount of the payment when it was made, but cannot now recollect the amount; but witness is satisfied that the payment made to uncle William was the full amount of his share of the proceeds arising from the first sale of the said farm; deponent never drew or witnessed but one receipt or acquittance, which he has before mentioned, from his uncle William to his father as executor as aforesaid, for the share of his said uncle William; all the transactions of which deponent has spoken, between his father as executor as aforesaid, and his uncle William, took place long before the death of deponent's uncle Cornelius Williamson, and before the bill filed in chancery by the heirs of the said Cornelius against my father, for the purpose of setting aside the first sale of the said farm.

The papers and vouchers referred to in the foregoing deposition of Peter Williamson, were produced at the time of his examination, and made exhibits on the part of the complainant.

May 7th, 1832. Peter Williamson, being again examined, deposed as follows: He recollects having a conversation with Asher Williamson, at Pennington, in the county of Hunterdon, some years ago, on the subject of a payment made by Samuel Williamson, deponent's father, as executor of William Williamson, deceased, to William Williamson, one of the sons and legatees of the said deceased, for his share of the moneys arising from the first sale of the real estate of the said William Williamson, deceased, and also on the subject of a receipt given by the said William Williamson to the said Samuel Williamson as executor for the said share; that conversation took place at Pennington, in Hunterdon county, many years ago; the particular year deponent does not recollect, but it was during the pendency of a suit in the Court of Chancery of this state

between Asher Williamson and others, complainants, and Samuel Williamson, executor as aforesaid, defendant; they were taking some examinations in that suit, at the time of this conversation, before James Linn, esquire, a master in chancery; in that conversation, I told Asher Williamson that such a payment had been made, and a receipt given, to which deponent and Uriah Bonum were witnesses, and that if the receipt was ever found it would so appear; deponent's father was not present at this time; deponent attended the examination on behalf of his father.

Some years after this time, and during the lifetime of deponent's father, the particular day and year the deponent cannot now designate, the deponent met Asher Williamson at the tavern of Joseph Kughler, in Amwell, Hunterdon county, for the purpose of making a settlement of the account of Samuel Williamson, as executor of William Williamson, deceased; on that occasion, the receipt of which deponent has last spoken, and which is mentioned in his former deposition, was produced; deponent thinks it was produced by William Maxwell, esquire; deponent saw it, and had it in his hands and examined it; deponent believes Asher Williamson saw it also; he was there, and deponent conversed with him respecting the receipt, and recollects telling Asher that he, deponent, hoped there would now be no more dispute respecting the receipt; deponent's father was unwell and was not present that day; deponent attended on the part of his father.

Afterwards, and after the death of deponent's father, and also after the farm of Benjamin Johnson had been sold at the suit of William Pennington, late Governor of the State of New Jersey, to Cornelius Williamson, deponent recollects Benjamin Johnson's coming to his house and inquiring of him respecting a payment made by Samuel Williamson, as executor of William Williamson, deceased, to the said William Williamson the younger, for his legacy or share of the moneys arising from the first sale of the real estate of the said testator, made by the said Samuel Williamson, and the receipt or acquittance therefor; deponent then informed said Johnson that there had been such a payment made, and that there had positively been such a receipt given, and if it was ever found, it would so appear; de-

ponent had at that time a number of papers of his father's in his possession, and he and Johnson searched them all over, but could find no receipt.

January 11th, 1831, Charles Bartles, esquire, sworn on the part of the complainant, saith that he is acquainted with the parties in the above cause; has been in the office of Mr. Saxton since the year 1822; recollects that after the first sale of the property of complainant by virtue of an execution, at the suit of William S. Pennington, governor, &c., against the complainant, as survivor of Samuel Williamson, deceased, complainant came to Mr. Saxton's office; he complained that there was a mistake in the amount of the judgment for which that execution had been issued; that the judgment had been taken for more money than was really due upon the bond to the governor, and wished Mr. Saxton to try and set aside the sale; the complainant at the time stated that some moneys had been paid by Samuel Williamson, as an executor of William Williamson, senior, deceased, that ought to have been deducted from the amount recovered by that judgment.

Deponent recollects that there was a difficulty about ascertaining the amount that Samuel Williamson had paid to said William; he complained having no receipt to show it; that Mr. Saxton directed him (complainant) to go to several places, and amongst them to one Terhune's, to see if he could not find such a receipt, and also to examine for it among the papers of George C. Maxwell, deceased; Mr. Saxton observed at the time that said Maxwell had done Samuel Williamson's business, and that the receipt might be among his papers; deponent recollects hearing that a considerable deal of search was made for such receipt, and that after some length of time it was said to have been found; after it was found Mr. Saxton filed the bill in this cause; deponent recollects distinctly to have seen the receipt in Mr. Saxton's possession, among the papers in the cause, frequently, from the time it was found until it was lost again, which was about the year 1827; some time after the filing of said bill, a person calling himself Abraham Williamson, and representing himself to be the son and administrator of William Williamson the younger, deceased, and to be a citizen of the State of Kentucky, came to New Jersey, and

claimed the amount of the moneys recovered of Benjamin John-
son by the, said Asher Williamson, and then in his, Asher's,
hands; in conversation with said Abraham Williamson, I told
him, at several different times, that he, complainant, had filed
a bill in chancery for the recovery of a part of the money col-
lected by him, Asher, on the above-stated execution against
complainant; and that complainant said that that judgment
had been taken for the whole amount of William Williamson,
junior's, share of William Williamson, senior's, estate, and that
Samuel Williamson, the executor of William Williamson, sen-
ior, had paid, in his lifetime, to William Williamson, junior,
the amount of his share of the moneys arising from the first sale
of William Williamson, senior's, estate; and that he, Wil-
liam Williamson, junior, had given Samuel Williamson a
receipt for it, which had not been allowed in making up that
judgment; deponent, at Abraham Williamson's request, pro-
duced the receipt and showed it to him; he admitted the sig-
nature to it to be the handwriting of his father, and several
times said he would go to Asher and get him to allow the
amount of said receipt, and pay it back to complainant; at
one time deponent recollects he (Abraham Williamson) came
to him and got him to make out a statement of the amount of
said receipt, and said he would go to complainant and pay him
back; this was in 1827; he said then that the whole of the
moneys collected by Asher Williamson upon said execution
against complainant would be coming to him; some time
shortly after this, he, Abraham Williamson, came to deponent
again, saying he had lost the statement above mentioned, and
wanted deponent to make him another; deponent got the pa-
pers in the cause, took out the receipt, and made another state-
ment for him; this was done in Mr. Saxton's office, he, Abra-
ham Williamson, sitting by all the time; a short time after
this, I understood that the parties were to have a meeting at Mr.
Saxton's office, to try and settle the matter, upon a certain day
fixed by them; they met accordingly; Mr. Saxton being absent,
they wished me to get the receipt and ascertain the amount
due on it; I got the papers, and, upon examining them, the re-
ceipt was gone; I told them I could not find it; he, Abraham
Williamson, then said he was willing to pay the amount of the

receipt to Johnson, complainant, but that the receipt must first be produced; deponent then mentioned to him that he, Abraham Williamson, had a statement of the amount of the receipt, and that he could as well settle the matter by that as by the receipt itself; his only reply was, " produce the receipt;" he said he would not settle unless the receipt was produced; in speaking of a settlement with complainant, at different times since, I have heard him say, let them produce the receipt, and he would pay it; at other times, " they can't produce the receipt;" from the whole conduct of said Abraham Williamson, at the time they met at Mr. Saxton's office to settle, and afterwards, he, deponent, has been induced to believe, and does believe, that he, Abraham Williamson, had stolen the receipt at the time deponent made the last statement of the amount of it for him; deponent has made search for the receipt since, and has not been able to find it; thinks the receipt was given for about £130; deponent says the application of the said Abraham Williamson for statements of the amount of said receipt were made by him in the absence of Mr. Saxton from his office.

January 11th, 1831, William H. Johnson, sworn on the part of the complainant, saith he is the son of complainant; he recollects that, at the time of the first sale of his father's property, by virtue of the execution in favor of William S. Pennington, governor, &c., his father was much surprised at the amount stated to be due upon the execution; he thought it was too high, and that, after the second sale, he (father) went to one Abraham R. Sutphen to get him to come with him to Saxton's to try and recover back a part of the money that had been collected at that sale; recollects that his father went to different places, at different times after this, to look for a receipt given by William Williamson, junior, to Samuel Williamson, executor of William Williamson, senior, and that he, deponent, went at request of his father to different places and persons to look for it, and could not find it; that finally deponent, Abraham Gulick, complainant, and Abraham R. Sutphen, came to Mr. Saxton's office; Mr. Saxton proposed to them that they had better go to William Maxwell, esquire, and search among the papers of G. C. Maxwell, esquire, for it; deponent and father went together to Mr. Maxwell's; he, William Maxwell, looked for

the paper, but could not find it; he said he thought probably that it might be at Mr. Clark's office, among papers in his charge; Mr. A. Wurts and deponent then went to Mr. Clark's office, who was absent, and had left his key with Mr. Wurts, and, after searching awhile, we found a bundle of papers relating to William Williamson's estate; we brought the bundle to Mr. Saxton's office, and, upon examination, found in it the receipt in question—the same we had been looking for; the amount of it, deponent does not recollect, exactly, but he is sure it was for more than £100; deponent's father and Mr. A. R. Sutphen then requested Mr. Saxton to file a bill in chancery to recover back the amount of that receipt.

January 13th, 1831, Abraham R. Sutphen, sworn on the part of the complainant, saith he is acquainted with the parties in the cause; recollects hearing, at the time of it, of the first sale of complainant's property, at the suit of William S. Pennington, governor, upon execution; conversed with complainant, about the time; recollects that he complained of the large amount of the judgment; that he said it was security money, but deponent does not remember the conversation distinctly; complainant, however, has frequently expressed to deponent that he was disappointed by that judgment; that it was for a much larger sum than he had expected, and that there was some mistake in making it up; that a certain payment should have been credited, in making it up, that had not been credited, but what payment, or for what sum, deponent does not now recollect; deponent recollects going, at complainant's request, in company with Abraham Gulick, to one Abraham Terhune's, in the county of Somerset, where Samuel Williamson died, to examine his papers, and see if there was not a receipt or some paper among them, that whould show the amount of moneys paid out by him as executor of William Williamson, senior, deceased; Mr. Terhune's family showed us all the papers (as they said) of Samuel Williamson; we examined them, but found nothing relating to the matter we were inquiring into; we returned and informed complainant; he appeared to be surprised at the information, and seemed to think that they had destroyed the paper; complainant was still very anxious to search for and find the paper, and appeared to be very certain

that there had been such a paper, and that it must be in exist-
ence yet, unless it had been destroyed; some time after, this
deponent was in the office of Peter I. Clark, esquire, and, seeing
Mr. William Maxwell there drop some papers upon the floor, in
pulling out a pocket-book from his pocket, he, deponent, picked
up some of them, and saw upon them the name of Samuel
Williamson, deceased; he informed complainant of that cir-
cumstance, and told him that he rather thought the paper in
question, if in existence yet, must be in his, Maxwell's, office;
the bundle of papers that Mr. Maxwell dropped from his pocket,
was taken up by persons present, and left in the possession of
Peter I. Clark, esquire; after this, deponent, complainant and
his son, William H. Johnson, and Abraham Gulick came to
Flemington in company, to see Mr. Saxton, and make further
search for the paper in question; Mr. Saxton advised us to
make further search for the paper, and, upon deponent's men-
tioning, again, the circumstance of his seeing the papers dropped
by Mr. Maxwell, it was concluded to go there, and to Mr. Clark's
office; Mr. Saxton suggested that Mr. Clark was gone from
home, and that they had better apply to Mr. Wurts, with whom
Mr. Clark had left the key of his office; William H. Johnson
and Abraham Gulick went accordingly, and, after some time,
returned with a bundle of papers relating to Samuel William-
son's business, to Mr. Saxton's office; the bundle was exam-
ined by Mr. Saxton, and the paper in question found in it, and
read in deponent's presence, purporting to be a receipt from
William Williamson to Samuel Williamson, executor of William
Williamson, deceased, for moneys paid by him; the amount,
about £130; don't recollect, exactly; deponent recollects that,
thereupon, Mr. Saxton advised the filing of the bill in chancery,
by deponent and complainant, in order to recover back the
amount of that receipt; deponent recollects conversing with
Asher Williamson about the matter, after the bill was filed by
Mr. Saxton; he, Asher, told deponent, at the time, that he was
satisfied, and really believed that the amount of that receipt
ought to be repaid to complainant, but that he could not do it;
he, Asher, at the time, made an estimate of the amount of it,
and, deponent thinks, made it over $1000—he thinks about
$1100; he, Asher, said he was willing to pay complainant the

amount of the receipt, but he did not want the lot to be sold which he had bought at the sale of Samuel Williamson's property.

On the 19th day of January, 1832, it being alleged that the complainant had departed this life since the commencement of this suit, intestate, and that administration, &c., had been granted to John T. Neely and William H. Johnson, upon whom the interest of the said decedent in the matters in question in this case hath devolved, it was thereupon ordered by Chancellor Vroom that this suit be revived at the suit of the administrators as complainants against the said defendant.

May 12th, 1832, Nathaniel Saxton, sworn on the part of the plaintiff, being shown the paper marked Exhibit A, in this case, deposeth and saith that he was present and saw Peter Williamson, the releasor, sign and deliver the same, and this deponent subscribed his name as a witness thereto; that it was executed on the day it bears date, and previous to the examination of the said Peter Williamson as a witness in this case; the deponent further saith that about the month of September, 1822, shortly after the first sale of Benjamin Johnson's property, on the execution at the suit of William S. Pennington, late governor, &c., against Benjamin Johnson, survivor of Samuel Williamson, deceased, the said Benjamin Johnson applied to the deponent to know if he could not be relieved against that sale, which he alleged had been made at a great sacrifice; he, at the same time, expressed great surprise at the amount demanded on the execution being so large—upwards of $2200; he stated that the judgment and execution were for moneys claimed by Asher Williamson, as administrator of William Williamson, deceased, for said William Williamson's share of the moneys arising from the sale made by Samuel Williamson, executor of William Williamson the elder, of a farm of the testator's, under the direction of the Court of Chancery, and for which he (Johnson) had become security for the said Samuel Williamson, but he did not know the amount that was due; that he had understood that Samuel Williamson had made a payment to William Williamson, in his lifetime, on the amount, but that before this action was brought Samuel Williamson had removed to the county of Somerset and died there, and left no executor, and no person had administered, as he knew of; and he knew not where to

find any papers or vouchers to prove the payment or show the amount really due; that he had also heard that about the time of the commencement of the suit against him, Asher Williamson had said that there was only about $1100 or $1200 due from Samuel Williamson, as executor of William Williamson, deceased, to him, Asher, as administrator of William Williamson the younger, deceased, on his share of the estate; from which he expected that Asher knew the amount actually due, and intended to claim no more; and in consequence of these circumstances he did not appear to make any defence in the action; that deponent inquired into the circumstances of the sheriff's sale of Johnson's property, which, in consequence of an irregularity in advertising, was abandoned, and a second sale made in May, 1823, which satisfied the judgment; Johnson then wished deponent to take some measures to recover back from Samuel Williamson's estate, if any could be found, the moneys he had been compelled to pay as his security, or to relieve him against this judgment, and recover back from Asher Williamson the amount paid over and above what was actually due; deponent advised him to take out letters of administration of the estate of Samuel Williamson, and also to go to one Terhune, in Somerset county, where it was said Samuel Williamson had died, and search for some receipt or voucher to show the payment made by Samuel Williamson to William Williamson; that about 10th June, 1823, Benjamin Johnson, Abraham R. Sutphen, Abraham Gulick and William H. Johnson came to deponent's office to consult further on the subject, and informed him that they had searched for, but had not been able to find any receipt from William Williamson; deponent then advised them to go to William Maxwell's, and search among the papers of George C. Maxwell, Esq., who had done business for Samuel Williamson, in his lifetime; one of the company went to Mr. Maxwell's, but returned without finding anything; it was then proposed by some one, deponent don't recollect who, to search at the office of Peter I. Clark, Esq., and one of the company, deponent thinks it was William H. Johnson, went, and after a short time returned with a bundle of papers of Samuel Williamson's, relating to the estate of William Williamson, deceased; upon opening this bundle and examining the papers

we found among them the receipt or acquittance under seal, from William Williamson to Samuel Williamson, executor of William Williamson, deceased, bearing date the 2d day of April, 1792, for £131 10s., in full for his share of the legacy under the will of the said William Williamson, deceased; this receipt was signed "William Williamson," and attested by two subscribing witnesses, one of whom deponent recollects was Peter Williamson, with whose handwriting deponent was acquainted, and whose signature he recognized; the body of the receipt appeared to be in the same handwriting as the receipt of John Hull and Margaret, his wife, marked Exhibit B in this case; it bore the same date, and deponent thinks was attested by the same witnesses; upon finding this receipt, deponent advised the filing of a bill in chancery, which, after procuring other documents and information, he prepared; at the time of preparing the bill he had this receipt of William Williamson before him, and intended to describe it, and believes he did describe it truly in the bill; this bill was filed on or about the 6th March, 1824, in the names of Abraham R. Sutphen, administrator of Samuel Williamson, deceased, and Benjamin Johnson, complainants, against Asher Williamson and others, defendants, to which a plea and demurrer was filed by Mr. Richard Stockton, solicitor for Asher Williamson; after argument of the demurrer, deponent had several conversations with Asher Williamson on the subject of the suit; in those conversations Asher objected, strenuously, against that part of the bill which sought a review of the former decree, and to set aside the sale of a lot of land sold as the property of Samuel Williamson, and bought by him, but made no objection to the relief sought against the judgment obtained by him against Benjamin Johnson; as to that, he said he knew that the receipt (alluding to the said receipt of William Williamson to Samuel Williamson, executor, &c.,) was right; that Johnson ought to have the money back; that if the bill had been filed for that only, he would have made no objection to it; that he was willing to pay that money back to Johnson if he would be justified in doing so; that deponent informed Asher that he would amend the bill so as to confine the object of it to the recovering back of the money overpaid by Johnson, and did amend the bill in the shape in which it

now appears; that deponent informed Asher that he had amended the bill in that way, and suggested that Mr. Stockton, his solicitor, could put in an answer admitting the facts as they really were, and upon that the cause could be heard and a proper decree made; that Asher assured this deponent that he would write to Mr. Stockton and authorize him to proceed in such a way that Johnson might get back the money overpaid, if it could be done, so that he, Asher, would be justified in paying it; that it was right that Johnson should have it, and he would as lieve pay it to him as anybody if he was safe in so doing; that deponent mentioned these conversations to Mr. Stockton, but a long time elapsed without Asher's calling upon him; that Mr. Stockton at length wrote to Asher, and this deponent delivered the letter, on the receipt of which Asher promised that he would go and see Mr. Stockton on the subject, but deponent never heard that he did; after Mr. Stockton's death, about 25th March, 1828, deponent gave Asher notice to appoint another solicitor, but no answer having been put in, on or about the 12th July, 1828, an order to produce proofs was obtained, after which Asher still proposed putting in such an answer that Johnson might get his money; deponent further saith that, some time after the commencement of the suit, a person calling himself Abraham Williamson, who claimed to be the son and administrator of the said William Williamson the younger, came to this country and called on deponent for information respecting the estate of William Williamson, deceased; deponent informed him what he knew about it, and that there was money in Asher Williamson's hands belonging to the estate of William Williamson, deceased, which he had recovered of Benjamin Johnson, but that there was a mistake—that Asher had recovered more than was due, and the present suit was depending to recover it back; he asked deponent to let him see the receipt of William Williamson, his father, as he said; deponent showed it to him, and read it to him; he said it was right, whatever his father had received ought to be paid back if it had not been allowed; he called on deponent frequently, and conversed on the subject, and finally proposed that he would settle with Johnson, and pay him back the money himself, and then proceed against Asher for the whole amount he had received; he pro-

posed compromising it, and paying something less than the full amount due Johnson, and wished deponent to settle it with him, which deponent declined doing, and proposed that he and Johnson should meet at deponent's office and settle it, which he agreed to, and a day was appointed; and he requested deponent to make a calculation, which deponent promised to do, but did not make the calculation or show him the receipt at that time; after he was gone deponent made a calculation; he believes the paper Exhibit F to be the calculation he made; at the time of making the calculation, he had the receipt of William Williamson the younger before him, and believes the date and amount of the receipt to be truly stated in that calculation; after making it, he put up the receipt among other receipts in a bundle of papers in the case, and put them in his paper case, and gave Johnson notice of the time of meeting; deponent went from home, he thinks, to attend court at Trenton, and did not return on the day of the proposed meeting until in the afternoon; he found Benjamin Johnson and Abraham R. Sutphen at his office, and was informed that Abraham Williamson had been there, but that Mr. Bartles could not find the receipt, and Williamson had refused to do anything; deponent then searched, but it was not in the bundle, and he has never been able to find it since; deponent is entirely ignorant of what has become of it, but is satisfied that it must have been surreptitiously taken out of his office in his absence; that it is lost and cannot now be found.

On the 8th of April, 1833, on a statement of the facts as is set forth and alleged in an order of this court made by Chancellor Vroom on the 19th January, 1832, it was, on the 8th of April, 1833, ordered and directed by Chancellor Seely, that the said order of the 19th January be confirmed as fully as if the same was made at this date, and that this suit be and do stand revived and continued by and in the names of the said John T. Neely and William H. Johnson, administrators, &c., of the said Benjamin Johnson, as complainants, against the said defendant, pursuant to the statute in such case made and provided.

On the 20th July, 1833, an interlocutory decree was made by Chancellor Seely, referring it to a master to take an account, &c.

On the 15th July, 1834, the defendant filed his affidavit as follows:

Asher Williamson, the defendant in this cause, being duly sworn, saith that on the 6th March, 1824, Abraham R. Sutphen, administrator of Samuel Williamson, and Benjamin Johnson, exhibited their bill of review against this deponent, and William Williamson and Cornelius Williamson, defendants, (stating the proceedings on the bill of review;) that afterwards, to wit, on the 15th day of October, 1827, the Chancellor ordered that the complainants have leave to amend the bill of complaint in this cause by striking out the names of Abraham R. Sutphen as complainant, and William Williamson and Cornelius Williamson as defendants, and also so much and such parts of the said bill as seek a review of the decree between William Williamson and others, complainants, and Samuel Williamson, defendant, in the said bill mentioned and set forth, and all other irrelevant matter in the said bill contained, so as to confine the object of the said bill to the relief of Benjamin Johnson against a judgment in the bill mentioned to have been obtained against him in the Supreme Court by this deponent, upon the said complainants' paying the defendants' solicitor the costs of the plea, demurrer and argument, and amending the copy of the defendants' bill gratis; that in the said suit on the said bill of review, this deponent and the said William Williamson and Cornelius Williamson had employed Richard Stockton, esquire, their solicitor and counsel; that Richard Stockton died sometime in the month of March, 1828, as this deponent hath been informed; that this deponent hath no recollection of ever seeing his solicitor after the opinion of the court was delivered; that when the opinion was delivered, sustaining the plea and demurrer, Mr. Stockton told him to go home and rest easy, that he would not be further troubled with that suit, and that it was at an end and that he was clear of it; that he never knew of any order to amend until on inspecting the files of this court this day he discovered it; that no amended copy of the complainants' bill has ever been served on him; that no subpœna in the above suit has ever been served on him; that some time after the death of Mr. Stockton, a notice was served on him, warning him to appoint a solicitor in his place; but as the ori-

ginal suit was at an end, as he conceived, and he had never any knowledge of any new suit by striking out the names of one plaintiff and two defendants, and a considerable portion of the original bill, he was ignorant whether he could be considered his solicitor in the new suit; nevertheless he applied to Garret D. Wall and Alexander Wurts to do what was necessary for him; that since that time he has supposed the suit at an end, never having heard any more of it, more especially as Benjamin Johnson, the complainant, hath since died; that no order reviving the suit has ever been served on him; that about three weeks ago he was informed by Mr. Wurts that a decree had passed against him in this case, and that it was referred to a master to take an account; that he immediately called on him, brought to his recollection the fact of his having given him a fee in the case, and that he believes that from some misconception between him and Mr. Wall in respect to who was to act as the solicitor, neither of them entered an appearance for him in this suit; that on examining the proceedings in this cause it appears that the decree was signed on the 12th July, 1828, but not filed until the 29th January, 1829; that the complainant produced documents, &c., in which it is alleged that a subpœna in this case was served on this deponent, which is not true; it is also alleged that a copy of the amended bill in this case has been served on Mr. Stockton, but it is not alleged that the costs were either tendered or paid to him; that in the term of January, 1832, it appears that the suit was ordered to be revived in the names of William H. Johnson and John T. Neely, administrators of Benjamin Johnson, and that on the 8th April, 1833, the said order was confirmed; and this deponent further saith that neither of the said orders was served on him; that in the term of July, 1833, a decree was made against this defendant, in his absence and without notice; that he hath never had notice of taking any depositions, and that he believed that the said suit was ended; and this deponent is advised that the said proceedings are irregular; and this deponent further saith that he is advised by his counsel that he hath a good defence to make in this case; that he is an administrator acting as trustee for others, and ought to make defence; that he is wholly ignorant of the receipt stated in said bill, of his

personal knowledge, and that he is ignorant of the handwriting of William Williamson, his intestate, and never saw said receipt or acknowledged or admitted it to be genuine or correct, and has no reason to believe that it is; that he never heard that any such receipt was pretended to have been given or any payment to have been made, (except as the same may be stated in the answer of Samuel Williamson, which he did not credit,) until after he had obtained judgment, in the name of William S. Pennington, against the said Benjamin Johnson, and after the money was raised by execution; that he never believed or admitted that the said money was paid, or receipt given, or in existence or lost, as stated in the said bill, and that according to the best of his knowledge and belief, the said money mentioned in the said receipt was never paid to the said William Williamson, his intestate; that he cannot on inquiry ascertain that he was in this state at or about the time it is stated to have been given; that he verily believes that it is his duty as a trustee to make defence in this suit, and it was always his intention to do so, and has been prevented by his error in thinking that the suit was at an end when the plea and demurrer filed by Mr. Stockton was sustained, and by his confidence that if anything was necessary to be done afterwards it would be done by Mr. Wall or Mr. Wurts, who were employed by him after he was warned to appoint a solicitor in the place of Mr. Stockton; and that he is about to apply to set aside said decrees for irregularity, and if he fails in that, to be allowed an opportunity for defence; that the said application is not made for delay, but *bona fide,* to enable him to discharge his duty, and to have a decree founded upon the justice and merits of the case.

On the 18th July, 1834, it was ordered, on reading the said affidavit, that complainants show cause on the first day of the next term why the interlocutory decree made in the term of July last should not be set aside for irregularity, and if it should be held to be regular, then that the said complainants show cause, at the said time, why the said decree should not be opened and the defendant be permitted to file an answer, upon such terms as shall seem to the court equitable and just; and in the meantime that the complainants do abstain from any proceed-

ings under the said interlocutory decree, or from taking any account under the same.

On the 18th July, 1838, it was ordered that the defendant bring on the hearing of his rule to show cause at the next term, or that it be discharged.

On the 22d January, 1839, on reading an affidavit of Nathaniel Saxton, taken 21st January, 1839, an order was made discharging the rule to show cause, if cause be not shown during that term, and substituting James N. Reading as master.

On the 27th August, 1839, James N. Reading, esquire, one of the masters, made a report, whereby he found to be due complainants from defendant, $1988.50½.

On the 16th October, 1839, the report was confirmed, and final decree by Chancellor William Pennington, and execution issued, returnable to April Term, 1840, for the sum reported to be due, with interest from 27th August, 1839, and costs, $175, and interest.

On the 16th July, 1840, it was ordered that all further proceedings on the execution be stayed until the further order of this court; and that, in the meantime, the execution and levy do stand as a security for the complainants until the further order of this court.

On the 15th July, 1841, it was ordered that the decree and proceedings thereupon had in this case do stand as a security for any amount that the complainants may be entitled to recover in this case; that the defendant have leave to file an answer within forty days from the date of this order, and to examine witnesses, and to cross-examine any already examined, so that such examination be closed on or before the 20th day of September next, so that the cause may be heard at the next term of this court; and that the complainants have leave to read the depositions heretofore taken; and that the defendant serve a copy of his answer gratis on the solicitor of complainants as soon as filed, upon condition that defendant pay the costs taxed since the decree of July 20th, 1833, and including said decree.

On the 18th July, 1841, defendant filed his answer. He denies that, to his knowledge or belief, the said Samuel Williamson, on the 2d day of April, 1792, or at any other time, paid to William Williamson the younger, the sum of £131 10s., or

any other sum, for his share of the proceeds of the first sale; or that the said William made, executed, and delivered to the said Samuel Williamson, an acquittance or discharge in full of his said share, bearing date on that or any other day.

He says that he has heard, and believes it to be true, that the said Samuel Williamson, when he procured the said Benjamin Johnson to become his surety, received the said sum of $4734.22 in cash, and that he deposited in the hands of the said Benjamin Johnson, in order to secure him from any loss, the sum of $2000, or some other large sum of money, which sum remained in his hands at the time of the commencement of the action in the name of the said William S. Pennington; and this defendant further saith, that the complainant, Benjamin Johnson, as soon as he found that this defendant had commenced, or was about to commence an action against him, in the name of William S. Pennington, Chancellor as aforesaid, by a deed purporting to bear date on the 5th day of June, 1821, and to be made between the said Benjamin Johnson and his wife, of the first part, and William H. Johnson and Clarissa Johnson, the son and daughter of the said Benjamin Johnson, of the second part, for the pretended consideration of $10,000, did convey to the said William H. Johnson and Clarissa Johnson the three several tracts in the said bill mentioned, with full covenants; which said deed was acknowledged on the 29th day of September, 1821, and recorded on the 1st day of October in the same year. And the defendant charges that the said deed was made without a valuable consideration, and was contrived of covin and fraud, to defeat the recovery of any money on the said bond on which the said Benjamin Johnson was surety. That the said William H. Johnson and Clarissa Johnson made formal proclamation of their pretended title, and a parade of warning all persons from purchasing; and it was not until after this defendant had purchased the said property, (at the first sheriff's sale thereof, which was abandoned for irregularity,) and thereby evinced his determination to rely upon his legal rights, that the said Benjamin Johnson, William H. Johnson, and Clarissa Johnson saw fit to abandon the pretended deed so as aforesaid made; and the said William H. Johnson and Clarissa Johnson became the purchasers of the same property at sheriff's sale, and after-

wards hit upon the expedient of setting up the pretended receipt set forth in the bill of complaint.

He denies that he ever knew or believed that the said Samuel Williamson had ever paid to the said William Williamson the younger any part of his share, or that he ever was so told by any person, or ever admitted that the said Samuel Williamson had ever paid any part of the said share to the said William Williamson the younger; and he expressly denies that the payment of the said sum of money pretended in the bill of complaint to have been made by the said Samuel Williamson to the said William, and the existence of the said receipt therefor, was well known to this defendant, or that he had repeatedly, or at any time, admitted that a payment had been made, or that, after the commencement of the suit against the said Benjamin Johnson, and before the execution of the said writ of inquiry, or at any other time, he had admitted that there was only $1000 or $1200 due to the said William, which was all he expected to recover of the said Benjamin Johnson, or any other sum less than the whole amount of the share of the said William, ascertained in the before-mentioned suit in chancery, prosecuted by this defendant and his brothers and sisters, against the said Samuel Williamson. And he further denies that he ever saw any such receipt, or that any such receipt was ever shown to him by any person whatever.

He admits that, in the answer of the said Samuel Williamson to the bill filed by this defendant and his brothers and sisters, he, the said Samuel Williamson, alleged that he had paid and satisfied the said William Williamson and John Williamson, two of the sons and devisees of the said William Williamson, deceased, their shares; and, in the same answer, he also alleged that he had settled with the father of this defendant for his share; and, inasmuch as he altogether failed to prove that he had settled with the father of this defendant, as he had alleged in his answer, and offered no proof that he had paid and satisfied the said William Williamson, in support of the allegation in his answer, or showed, or pretended to have any receipt or discharge therefor, this defendant did not, at any time, believe the allegation, in that respect, contained in the answer of the said Samuel Williamson, the more especially as this defendant

had never heard or believed that the said William Williamson ever came to New Jersey after the sale of the said farm of the said William Williamson, or that the said Samuel Williamson paid him, on the 2d day of April, 1792, £131 10s., in full of his share of the moneys arising from the first sale of the farm of the said testator, or any other sum of money, except what is stated in the answer of the said Samuel Williamson, which this defendant never believed to be true.

He denies that, after the decease of the said Samuel Williamson, or at any time before, he went to the house of the said Abraham Terhune, where he died, and examined his papers remaining there, or that he ever made any search anywhere, among the papers of the said Samuel Williamson, or any other person, for a receipt or acquittance from the said William Williamson to the said Samuel Williamson, or for any other paper belonging to the said Samuel Williamson, but, on the contrary, this deponent never believed that any such payment had been made by the said Samuel Williamson to the said William Williamson, nor does he now believe it, nor did he at any time believe, nor does he now believe, that any such receipt or acquittance was ever given by the said William Williamson to the said Samuel Williamson, as is pretended in the said bill of complaint, nor was any such receipt or acquittance ever shown to him, or offered to be shown to him, by any person, or seen by him, at any time; and he always believed, and still believes, that no proof, entitled to credence, could be produced of such payment, and that no such acquittance or discharge ever existed, or could or would be produced.

He admits that he did cause to be exhibited, before the said inquest, a claim for the whole amount of the share of the said William Williamson, deceased, of the moneys arising from the second sale and net proceeds of the said farm, upon the footing of the before-mentioned decree of October, 1813, with the interest thereon, without allowing any credit for any payment, and that the whole amount of the said claim was assessed and found for the plaintiff, by the said inquest, as is set forth in the said bill; but he denies that he knew, at any time, or suspected or believed, or does now, that such payment had been made and acquittance given, as is pretended in the said bill, or that the

same ought to be credited; or that the sum so claimed and found was not due and owing by the said Samuel Williamson, as executor as aforesaid, to this defendant, as administrator of the said William Williamson, deceased; and he also denies that the complainant was deceived and surprised by the conduct of this defendant, or had the slightest reason to impute any such surprise or deceit to the conduct of this defendant, which was honest, frank and in strict conformity to the principles of law, justice and propriety, in enforcing an honest claim openly and by due course of law; and the attempt now made by the complainant to impute fraud and deceit to this defendant is as unfounded and unsupported, even upon the facts alleged, as it is untrue and unjust upon the true state of the facts; and this defendant humbly insists that the complainant has been guilty, even upon his own showing, of gross laches and inexcusable negligence; neglecting the proper means of making a defence in the proper and lawful manner, relying upon the success of his fraudulent attempt to put his property beyond the reach of his creditors, in the hands of his own children; and it was not until he found himself defeated in that effort, that he seems to have resorted to this expedient to accomplish the same end by other means; and this defendant insists that it is apparent from the statement of the complainant, that he voluntarily slept over the defence now set up until he was awakened by discovering that this defendant had purchased his property at the first sheriff's sale, notwithstanding his fraudulent conveyance to his children, and all his efforts to place his property beyond the reach of a judgment would fail.

And this defendant further saith that the complainant, before this defendant caused an action to be brought against him upon the bond so as aforesaid given to William S. Pennington, in the lifetime of the said Samuel Williamson, well knew of the claim of this defendant as administrator of the said William Williamson, and that he would be held liable for the same; and yet, by his own showing, being informed of the alleged payment by the said Samuel Williamson to William Williamson, he makes no defence, and takes no measures to obtain evidence until he found that his effort to place his property beyond the reach of a judgment had failed; and this defendant avers that

at the time of the entering the judgment in the case of the said William S. Pennington, Chancellor, &c., against the said Benjamin Johnson, and the issuing of the execution thereupon, and the payment and receipt of the money thereon, as stated in the bill of complaint and this answer, this defendant did not know, other than as is hereinbefore stated to have been alleged in the answer of the said Samuel Williamson, to the bill of complaint of this defendant and others against him, as is set forth in the bill of complaint of the complainant; and he did not believe that the said Samuel Williamson had ever paid any part of the moneys due to the said William Williamson; nor does he know or believe, or had he heard, to his remembrance, that the said Samuel Williamson had, or pretended to have, any receipt or acquittance therefor; and this defendant verily believed that the allegation in the answer aforesaid, of the payment to William Williamson, was equally untrue and unsupported by evidence as the allegation of a similar payment to Cornelius Williamson, the father of this defendant, contained in the same answer; and he never took any measures, or did any act, or uttered any speech, which could mislead or deceive the complainant in relation to the said payment or receipt in any manner whatever, or prevent him from making any inquiries or defence he might see proper; or induce him to suppose that he claimed less than the whole amount of the proceeds of the sale and net rents of the said farm, upon the footing of the decree of October, 1813, coming to the share of the said William Williamson; and this defendant avers that the said judgment set forth in the bill of complaint, and referred to in this answer, is still in force, no ways reversed or set aside; that the matters in controversy, and the real, substantial parties were the same, and the whole merits of the case as stated in the complainant's bill might have been fully heard, tried and determined in the said action, and that the said judgment therein was obtained fairly and without fraud, covin or misrepresentation, or the taking of any undue advantage; and that no evidence has come to the knowledge of the complainant since the said commencement of the said action in which the said judgment was obtained, respecting any of the facts alleged in the said bill, which he might not have obtained and produced by the use of due and ordinary diligence in de-

Williamson v. Adm'rs of Johnson.

fence to the said action ; and this defendant insists upon the said judgment, and claims the same benefit thereof as if he had pleaded the same in this cause. And this defendant, for the reasons and under the circumstances aforesaid, is advised and insists that the said complainant is not entitled to any relief against this defendant touching the matters complained of in the said bill ; and also insists upon the said laches and negligence of the said complainant, and claims the full benefit thereof, as if the same had been pleaded also.

He denies that the complainant had not access to the papers of the said Samuel Williamson, or that he could not have found the papers of the said Samuel Williamson in relation to the said claim, or any documents or vouchers to enable him to contest or to make any defence against the same, or to create a personal representative of the said Samuel Williamson to investigate the state of his affairs, as well before as after the entering of the said judgment against the complainant, by the use of common and ordinary diligence and the appropriate inquiries and means for the purpose ; all the parties and witnesses residing in the neighborhood of the complainant, and it not being pretended that any papers were concealed or suppressed from him, or that any witnesses denied or withheld their knowledge when applied to in relation to any matter touching the same. And this defendant being entirely ignorant of the means used by the complainant to obtain information and papers respecting the pretended payment of Samuel to William Williamson, other than what is stated in his bill of complaint, neither admits nor denies what is stated by the complainant in his bill for that purpose, nor does he know anything in respect to the said pretended receipt from William Williamson to Samuel Williamson for £131 10s., bearing date the 2d day of April, 1792, nor has he ever seen any such receipt, nor does he believe that the said William Williamson ever received the said sum of money or any part thereof, or ever signed any such receipt or acquittance, or ever was in the State of New Jersey at the time it bears date, he, the said William, having left New Jersey before the revolutionary war ; and he has been informed and believes that the said William Williamson never could write his name or read writing. And this defendant knows nothing of the loss or mis-

laying of the said pretended receipt, and, therefore, does not admit any such loss or mislaying, and hopes that the complainant may be compelled to make strict proof thereof, inasmuch as such pretences are easily made, and such would be the mode resorted to if a pretended receipt should be set up.

He denies that, to his knowledge or belief, he obtained the said judgment and execution against the complainant for a larger sum than was actually due, by any such fraud, deceit, concealment or surprise as is pretended in the said bill, or by any fraud, deceit, concealment or surprise whatever; or that the complainant had not the same means in his power to obtain the said receipt, if any such existed, and to prove the said payment and ascertain the amount thereof, as he has since discovered, by the use of the same diligence and means as he subsequently used. And he insists that all the allegations contained in the said bill, in respect to this defendant having heard of such payment being made, or seen the said acquittance and discharge, and well knowing of the same being given, or admitted that there was only a balance of ten or twelve hundred dollars, or declarations that he intended to claim no more, as is pretended in the said bill, is utterly and entirely false.

He says that after the filing of the present bill, and in March, 1828, Richard Stockton, his solicitor and counsel, died, having before his death told this defendant, when the decision was made by the Chancellor on the plea and demurrer, to go home, and that he would not be further troubled with this matter. That after the death of the said Richard Stockton, and without any previous notice to this defendant, to his recollection or belief, on the 29th day of January, 1829, and without the payment of any of the costs, which was the condition precedent for the leave to amend ordered by the court, an order was illegally and upon false allegations obtained for the complainant to make proof of the allegations, in the usual form. And this defendant avers that he was never served with any order, or warned to appoint a solicitor in the place of his deceased solicitor, Richard Stockton, to his recollection or belief, and he supposed that suit was ended. That on the 19th day of July, 1832, an order was made suggesting the death of Benjamin Johnson, the complainant, and reviving the suit in the name of his administrators, the

Williamson v. Adm'rs of Johnson.

present complainants. That this order was never served upon this defendant, and was wholly illegal, there being no statute authorizing such a revival, and the only mode of revival then lawful, being by bill of revivor,

That on the 7th day of October, 1829, the deposition of Peter Williamson was taken, without any notice to this defendant, and, on the 7th day of May, 1832, his deposition was again taken, without any notice to this defendant. That on the 11th day of January, 1831, the depositions of Charles Bartles and William H. Johnson were taken, and, on the 13th day of the same month, the deposition of Abraham R. Sutphen was taken, without notice to this defendant, and, on the 12th day of May, 1832, the deposition of Nathaniel Saxton was taken; and all the said depositions were filed on the 16th day of July, in the same year. That on the 12th of February, 1833, an act of the legislature was passed, authorizing a revivor by rule, in the case of the death of a sole complainant, upon the terms and in the manner stated in the said law. That on the 8th day of April, in the same year, an order was made to confirm the previous order to revive.

And this defendant insists that the said order to revive, and the order to confirm the same, were wholly illegal and void, and all the depositions taken in the intermediate time were illegally and unlawfully taken, and the depositions ought not to be heard in this case. That on the 20th day of July, 1833, an interlocutory order was made, referring it to Alexander Wurts, one of the masters of this court, to take an account, and, on the 18th day of July, 1834, an order was made substituting Andrew Miller as master, instead of the said Alexander Wurts, and, on the same day, this defendant, having been informed, accidentally, of the said proceedings, and never before having had the slightest idea but that the said suit was ended, made an affidavit, and applied to the court and obtained an order for the complainants to show cause why the said decree and all proceedings should not be set aside or opened. On the 15th day of October, 1838, an order was made that this defendant should bring on the argument of the rule to show cause at the next term, or that it should be discharged. And on the 22d day of January, 1839, an affidavit was made of the service of a copy of the before-

mentioned rule, and an order made discharging the said rule to show cause, on the same day.  On the 4th day of September, in the same year, a report was made, and, on the 12th day of October, in the same year, a decree was made, which was opened in the term of July last, and this defendant permitted to answer, as by the said several proceedings, to which this defendant begs leave to refer, will more fully and at large appear.

And he insists that the said proceedings were and are void— in the first place, because the complainant had leave to amend only on condition of paying costs, which he never paid, or took any measures to pay ; in the second place, that he never warned this defendant to appoint a solicitor in the place of the said Richard Stockton, or gave this defendant any notice of the said proceedings, although he lived within five miles of the residence of the solicitor of the complainant ; in the third place, the suit abated on the death of the complainant, and the order for revivor was utterly void, and the order subsequently made to confirm the same was also void, as not pursuing the act and not amending the complainant's bill and order on defendant to answer the same, and the order discharging the rule to show cause was irregular, and all the subsequent proceedings ought to have been vacated and set aside.  And he saith that the money which he recovered of the said complainant belonged to him, as administrator of the said William Williamson, who died intestate, in the state of Kentucky, leaving issue—Abraham, William, Richard, John, Samuel, Cornelius, Margaret Wilson, Mary Smoot, and Micha Bailey, his next of kin.  That the said Abraham, in his own behalf, and holding letters of attorney from some of the other heirs of William Williamson the younger, issued a citation in the Orphans' Court of the county of Hunterdon, returnable in the term of October, 1824, to show cause why his letters of administration should not be revoked, and obtained a decree to that effect, and to the term of February, 1825, issued a citation out of the same court for this defendant to account, and the said proceedings are still pending, Nathaniel Saxton, the solicitor for the complainant, being the attorney of the said Abraham Williamson, and thus harassing this defendant with a double and conflicting claim.

And he further saith, that while the said proceedings were

pending against him, at the instance of the said Abraham Williamson, by his attorney, Nathaniel Saxton, and when he supposed that the suit in chancery, instituted by the complainant, was ended, he endeavored to free himself from the other demand, and accordingly, on the 28th day of September, 1831, he paid to the said Micha Bailey and Thomas Bailey, her husband, (which said Micha was one of the children of the said William Williamson the younger,) her full distributive share of the said estate, and took their receipt therefor; and on the 30th day of September, in the same year, he paid to Mary Smoot, another child of the said William, the full amount of her distributive share, and took her receipt therefor; and on the 2d day of March, 1833, he paid to Joseph Williamson, the attorney in fact of the said Abraham Williamson, William Williamson, Richard Williamson and John Williamson, and of Perry Weakley, administrator of Samuel Williamson, Cornelius Williamson and Margaret Wilson, the other children of the said William Williamson, and next of kin, and took his receipt for their several distributive shares.

And he further saith that, at the time he made the said payments of the distributive shares to the said Thomas Bailey and Micha, his wife, Mary Smoot, Abraham Williamson, Richard Williamson, John Williamson and William Williamson, and Perry Weakley, administrator of Samuel Williamson, Cornelius Williamson and Margaret Wilson, severally, he fully believed that the suit, so as aforesaid instituted against this defendant by the said complainant, was ended, and was wholly ignorant that it lay in waiting to be sprung upon him as soon as the contest with the heirs and distributees of the said William Williamson was ended.

And he further saith that the said Thomas Bailey and Micha, his wife, Mary Smoot, Abraham Williamson, Richard Williamson, William Williamson and John Williamson, and Perry Weakley, administrator of the said Samuel Williamson, Cornelius Williamson and Margaret Wilson, or their legal representatives, if any of them be deceased, severally, ought to be, but are not, made parties to the said bill; and he claims the same benefit as if he had pleaded such want of parties in this case.

The order for closing testimony was enlarged from time to time, on application of complainants, until thirty days from the 11th November, 1842.

Peter Williamson, whose deposition was taken *ex parte* on the part of the complainant, being called by the defendant for the purpose of cross-examination, being duly sworn, saith—I shall be 79 years old on the 24th of July next; my uncle William removed from New Jersey before my recollection; he was at my father's a long while ago; I forget whether I was married or not; it was after my grandfather's death; my grandfather died before my recollection; I don't know exactly whether it was before my father sold my grandfather's property or not; I was grown up; it was said he came up to get money of my father, as executor of my grandfather; I don't know whether he got money the first time or not; whether he got the money the first or second time he came, I cannot recollect, but I once wrote a receipt; I don't know how long it was between the first and second time he came; I think he lived in Virginia when he came the second time; never brought any of his family with him, but came alone both times; when he came the first time, I lived in Amwell, with my father, and don't know but I did the second time; I lived with my father one year after my marriage; I think I was married in my 22d year—my first marriage; I then moved to Six Mile Run, near Brunswick; I lived there two years; then went to my father's, and in two or three weeks moved on the old homestead farm; I lived there a considerable time; don't know whether I lived there when it was sold by master Linn; it is thirty-three or four years, I think thirty-three years, since I moved away from the homestead; all this I could tell exactly if at home; when my uncle William came the second time, I lived on the old place—the old homestead; I remember this by the fact that he went with me at that time to grandmother De Hart's burying; my grandmother's name was Micha; she was buried at Six Mile Run; I think my uncle William was in about a month, but can't be positive as to the time; he stayed at my father's the principal part of the time while he was in; I should not like to be right sure whether the receipt I spoke of was given the first or second time, nor do I remember the sum, nor whether I saw any mo-

ney paid; the receipt was for his legacy; I wrote the receipt—uncle William signed it; there was some little dispute about it by my father; I wrote a receipt first; my father did not like it, and stated his objections; it was burnt, and he told me how I should write it; uncle William signed, or made his mark; he sat by when I read it; am not sure whether he signed or made his mark—think he signed it; am not sure whether he could read writing or not, but he looked at it as if reading, a considerable time; John Hull, who married my aunt Margaret, was present at the time; nobody but us three and aunt Margaret and uncle John were present at the time; I don't now remember of anybody else being present at the time; I read the second receipt aloud in the presence of uncle William and the others; this took place at John Hull's house; I asked my father, at his own house, which is $4\frac{1}{2}$ miles from the homestead, why the business could not be done at home; he said it could not, but must be done at Hull's; that uncle Bill would be there; uncle Bill was not present at this conversation between me and my father; John Hull lived on a lot which I believe belonged to his wife, aunt Margaret, about a half mile from the homestead; the receipt was given after the funeral of Micha De Hart; I think the receipt was in full of uncle William's share of grandfather's estate; there was money handed about, but I do not now recollect the amount; don't know that uncle William owed father anything, or that father ever paid him anything before father took the receipt home; don't know that I ever saw it afterwards; there has been great inquiry for it; if I have ever seen it since, I have forgotten it; I never showed it to Asher Williamson; I could not show it, for I *hadn't* it; never, that I know of, told Asher Williamson that such a receipt had been written by me and signed by my uncle William; don't know that I recollect the amount of the receipt; there was no other receipt given or payment made at that time, nor about that time, that I know of; if there was, I should have wrote it, but I didn't; aunt Micha Williamson lived with me at the old homestead, at the time of the receipt; I expect she had a money legacy left to her by her father; was never present at any payment to her by my father; I recollect on one occasion hearing aunt Micha growl at her son who lived with

her, and who had bought a horse with money obtaind from her; she said that money would soon be gone, and I supposed she alluded to the legacy from her father; father did not pay any money, that I remember, to aunt Margaret or uncle Hull, the day of the receipt from uncle William; nor do I recollect to have seen any money paid by my father to either of them for her legacy; they might have paid it a hundred times, and I not been present; I never drew a receipt, that I remember, from John Hull and Margaret, his wife, to my father, as executor of my grandfather, for her legacy; I think if I had I should remember it, but do not remember it; I never witnessed such a receipt; I don't know of any other receipt than that from uncle William on the day that was given; at the time uncle William got the money, uncle John lived in Virginia, as was said; he was in after the second visit of uncle William; I remember that perfectly well, because he borrowed a book of me which he promised to return, but never did; don't remember how long it was after uncle William was in, that uncle John came; can't recollect whether it was about that time, or some two or three years afterwards; I was once at uncle William's and uncle John's, in Virginia; they lived not far apart; I guess it was before he, uncle William, was in; it might have been after the first time; I went there to spend money, as my father said; it was the second year after I was married; I went there to see the country; can't tell what part of Virginia it was; I understood uncle William moved away from Virginia afterwards, but whether he did move, and where he did move, I do not know; the graveyard where grandmother Micha DeHart was buried, is a mile below the present church, towards Brunswick, between the turnpike and the old road; I expect the time of her death appears upon her gravestone; don't recollect being at Joseph Kughler's tavern in Amwell, with my father and Asher Williamson, respecting the estate of my grandfather; don't know that I ever recollect seeing William Maxwell, esquire, with my father and Asher Williamson, at Kughler's; if I did, I have forgotten it; don't recollect anything about that receipt having been exhibited to Asher Williamson at Kughler's; I think if I had ever been present when that receipt was exhibited, I should now remember it; it was disputed, one spell, whether there was

a receipt at all or not; Benjamin Johnson asked me about it, and I told him I recollected it perfectly well; and then Johnson and myself made a search for nearly a day among my father's papers, but could not find it; I told Mr. Johnson I was sure there was such a receipt; this was some time after my father's death; don't know that I ever had a conversation with Asher Williamson, at Pennington or elsewhere, about said receipt; don't remember being examined as a witness in the chancery suit between my father and the heirs of my uncle Cornelius; I don't remember being examined before James Linn; I remember being in Pennington once, but don't remember what took place; I am of opinion that Uriah Bonum came to uncle John Hull's while we were settling that business; I knew him; it was said that Bonum lived in Kingwood, not a great ways, two or three miles from the old place; he was considerable older than me; he is not living now; I know I lived on the homestead place several years; don't remember how many; I moved away from it before the war; can't tell whether I lived on it till it was sold by master Linn or not; I might have made this all out by writing I have at home, if I had a little notice; I moved from the place to Flemington, and kept a tavern two years, belonging to John Van Middlesworth; then I bought a house at Ricefield, in Somerset county, about 2½ miles from Flagtown; I got a license and kept a tavern at that house two years; I went to Ricefield in 1812; I moved from Ricefield to Amwell, where John Hill now lives; I lived there a year, and then went down to the river, near John Phillips' mill, below Lambertville; I stayed a year at Phillips' mill, then went to John Knowles', about a mile from the river, where I lived a year; I then went to the place where I now live, where I have been ever since; I think it is ten years next spring that I have been there, but I am not right sure; there was no farm to the tavern at Ricefield; I gave $1450 for it; I got part of the money from my father to pay for it; can't say how much; guess somewhere about half of it; all this I could tell if I was home; never got any money from him since or before; how my father's property was at his decease is more than I know; but think there was more due to me if it had been divided; but we never could find his will; he made a will, I know; he died at

Abraham Terhune's, near Princeton, and I always thought they knew what became of the will; Abraham Terhune married my sister; my father lived at Terhune's two years, more or less, till his death; don't know what property he had when he went to Terhune's; I don't remember that I ever told Asher Williamson that I was present at any payment from my father to uncle William, or of any such payment; if I did, I have forgotten it; there are many things asked me now which I do not remember.

And in answer to questions put on the part of the complainants, the witness further saith, (being shown a paper marked Exhibit B)—The signature Peter Williamson, as a witness, on the paper, is my signature; don't know Uriah Bonum's handwriting, but expect that signature is his handwriting, or it would not be there; the body of the paper is my handwriting, and so is the name of Margaret Hull; she made her mark, not being able to write; I don't know that I have any recollection of the occasion when that paper was made; I guess it was not at the time uncle William gave his receipt at John Hull's; I remember that I made a mistake in the date; I wrote it the first day of the month; father said it was the second, not the first, and I immediately made the alteration; the paper was executed the very day it bears date; I saw John Hull sign it, and Margaret Hull make her mark.

And in answer to questions put on the part of the defendant, the witness further saith—The receipt marked Exhibit B was made at John Hull's house; I think my uncle William was not present; it was done some time after he went away the last time; can't tell how long it was after uncle William went away; can't tell whether Bonum was there by accident, or whether he was sent for at the signing of Exhibit B; I remember well what Bonum said at that time; aunt Margaret was growling at the amount; Bonum said to her, you ought not to growl, it was not the fault of the executor; her father had done it; Bonum, I think, was present when uncle William gave his receipt, but can't be certain.

Abraham R. Sutphen, a witness examined on the 13th of January, 1831, on the part of the complainants, being called, on a cross-examination on the part of the defendant, the said

defendant protesting that the said examination was illegal, ana not waiving any objection thereto, saith—I am about sixty years of age; I took out letters of administration of the estate of Samuel Williamson, deceased; I was not at all related to him; was not a creditor, nor had any concern or interest in the estate; it is so many years ago, I do not recollect at whose instance I took out the letters; I believe it was at Benjamin Johnson's request; can't say who paid the expenses of the administration; I have not got the letters, and do not know where they are; I was a very distant relation of Benjamin Johnson's, so far that I am not able to say what the relationship was; don't recollect anything of authorizing a bill to be filed for me as administrator of Samuel Williamson, against Asher Williamson and others; don't recollect ever feeing counsel in the matter; it appears to me that there was a little estate of Samuel Williamson; it was a trifle anyhow, and I don't recollect now what it was; I never knew the handwriting of William Williamson, the brother of Samuel, or of Peter Williamson, the son of Samuel, or Uriah Bonum; never saw any one of them write; I saw a receipt purporting to be given by William Williamson to Samuel Williamson, executor of William Williamson, deceased; I don't recollect the exact sum; it was in pounds, and was over a hundred pounds; don't know whether it was genuine or not; I thought it was—it appeared so; the receipt was for a hundred and thirty-some pounds; I saw the receipt in 1827 or 1828, I think, but can't be certain as to the time; I think something has passed between Asher Williamson and me about the receipt, but what it was I cannot say; don't recollect that Asher Williamson ever admitted to me that the receipt was genuine, or that he had any knowledge of it; I recollect hearing Asher Williamson say that if they could find such a receipt he would be willing to pay it, provided he could be clear in so doing; he said he didn't believe there was such a receipt; I cannot tell when or where this conversation was, or whether any person was present; I knew Peter Williamson by sight for some time; I know nothing about his character for truth and veracity; I have been out of the neighborhood for many years.

And being examined further on the part of the complainants,

saith—I recollect further, that in a conversation between Asher Williamson and myself, Mr. Williamson said that if there was a receipt, Benjamin Johnson ought to have the money back again; and he certainly admitted to me that there was such a receipt; I can't remember whether the conversation now alluded to was before or after I filed the original bill with Benjamin Johnson against Asher Williamson and others; it was after we went to Terhune's to look for the receipt.

[A copy of deed from Benjamin Johnson to William H. Johnson and Clarissa Johnson was produced and offered on the part of the defendant, and marked Exhibit No. 1.]

William H. Johnson, a witness who was examined on the part of the complainant on the 11th of January, 1831, in the lifetime of his father, and being now cross-examined on the part of the defendant, the defendant excepting against the legality of his evidence, and not waiving any exception thereto, and the witness desiring to be excused, inasmuch as he was a party in the cause, being duly sworn according to law, saith—I am one of the grantees in this deed (Exhibit No. 1 being shown him); the three tracts described in Exhibit No. 1, are the same three mentioned in the sheriff's levy in Exhibit No. 2; that was all the land belonging to my father, excepting a wood-lot of about nine acres, called the Field lot, which was sold after his death by his administrators; John T. Neely married Clarissa Johnson, the sister of the witness and the other grantee mentioned in Exhibit No. 1; Clarissa and myself were the only children of Benjamin Johnson; my sister and myself became the purchasers at the second sale made by Edward Welsted, sheriff of Hunterdon, mentioned in the pleadings in this cause; we paid the purchase money to Mr. Welsted, also mentioned in said pleadings; the money I borrowed—some of my uncle, Lawrence Hann, of Morris, and some of my father-in-law, Jacob Case, of Hunterdon; the case was instituted to recover back such amount of money as should appear was not due on the judgment; in respect to the receipt mentioned in my principal examination in 1831, I did not know the handwriting of Williamscn or Uriah Bonum; I never saw either of them write, noi never knew either of them; could not say as to the hand writing of the body of the receipt; can't say whether the nam

Williamson v. Adm'rs of Johnson.

of Peter Williamson or Uriah Bonum were subscribed as wit
nesses thereto, but do recollect that the name of William Wil-
liamson, as signer of the receipt, was there; I never employed
counsel in the case during my father's life, nor did I ever
advance money to my father to employ counsel with; I did not
authorize my father to institute the suit.

Question by Mr. Saxton.—Had you ever a conversation with
Asher Williamson respecting this case, and the payment by
Samuel Williamson to his brother William?

[Question objected to by Mr. Wall, insisting that it is unlaw-
ful, and that the witness is not competent to testify to any new
matter in this case.]

Witness.—Asher Williamson and Neely and myself had a
conversation, on the porch of the county tavern at Flemington;
I and my brother-in-law felt anxious to settle, and thought we
could settle; Mr. Williamson said he understood there was such
a receipt, and he was willing to settle, if he could satisfy the
heirs; he never made any objection to the genuineness of the
receipt, nor did I ever hear any such objection before to-day;
this conversation was after the death of my father, but how
long after, I cannot tell; my father died in August, 1831, I
think.

Question by Mr. Saxton.—Did not Abraham Williamson,
who professed to be the son of William Williamson, tell you,
some time after you saw the receipt, that it could not be pro-
duced?

[Mr. Wall objected to the question, as unlawful, and that the
witness is incompetent.]

Witness.—He did, and defied us to produce it, and said if we
could produce it, it should be paid.

James S. Manners, called on the part of defendant, being
duly sworn, saith—

Question by Mr. Wall.—What is the general reputation of
Peter Williamson, the witness who has been sworn in this case,
in the neighborhood where he lives, for truth and veracity?

[Mr. Saxton objects to the question, insisting that it ought to
be, What is his general reputation for truth and veracity, under
oath as a witness?]

Witness —I have never lived exactly in the neighborhood of

Mr. Williamson; I believe Mr. Williamson is allowed to talk a little at random, as some of the rest of us do, sometimes; I have frequently heard his general reputation for truth and veracity doubted, but with what propriety, I cannot say; I lived, till this spring, between six and seven miles from the old homestead farm of William Williamson, and about nine miles from Flagtown, and eleven and a half miles from Ricefield, and not more than six miles from where he, Peter Williamson, has lived the last ten years; we lived in the same township, during the last ten years, until the township was divided, about three years ago; that division threw me into Raritan, and left him in old Amwell township; since last spring, I live within about four miles of him; I have known him thirty-five, certainly—perhaps forty years; this has been his reputation, with some people, during the whole time I have known him; personally, Mr. Williamson has always treated me well, and there has always been the utmost kind feeling between us.

And being cross-examined on the part of the complainants.

Question by Mr. Saxton.—Have you ever heard a respectable, reputable man say that Peter Williamson was not to be believed under oath, as a witness?

Answer.—I have heard a respectable man say that there was a case in which he tripped, and he, the person who spoke, knew it; I mean by tripped, swore falsely.

Question by Mr. Saxton.—Was that man interested in that case?

Answer.—No, not at all—no connection with it.

Question by Mr. Saxton.—Did you ever hear any other man say that he knew it?

Answer.—No; not that they knew it, but that they doubted the truth of what Williamson had said under oath, as a witness in any other case than the one before mentioned; I never heard anything against his general character for truth and veracity, under oath, in relation to any other case than the one mentioned; that case was on his application for a pension from the United States, as a revolutionary character; Henry Gulick, Williamson's brother-in-law, was the man who said Williamson had sworn falsely, and he knew it; he said they were boys together, and he knew Williamson's statement was not so; he

told me at my house; I have heard a great many who spoke about it express the same opinion; I never heard any one speak about it who did not say he doubted the truth of Williamson's story; Henry Gulick was the only one I ever heard say he knew that Williamson's statement was false; I heard Peter I. Clark say that he doubted that Williamson was entitled to the pension; Mr. Clark received Williamson's pension for him at Trenton, as he told me on the way up; I do not know that I could name any other person who expressed the same opinion, but whenever I have heard any one talk about it, they have always expressed the same opinion; I do not know that Henry Gulick ever saw Williamson's affidavit for a pension; he went upon the presumption that Williamson had made affidavit to sufficient service to draw a pension, and he said that he knew that he was not out more than two months.

George Holcomb, a witness produced on the part of the defendant, being duly sworn, saith—If I live to see December 7th, I shall be seventy-one; I have been in the mercantile and milling business together ever since I was a little rising twenty, till within twenty years back; I lived in the county of Hunter don all the time but about five years during the war, when I lived in New Brunswick; I am acquainted with Peter Williamson, the son of old Samuel Williamson; I lived within about two miles of him until about a year or two before I went to New Brunswick, in 1810 or 1811.

Question by Mr. Wall.—What is and has been the general reputation of Peter Williamson in the neighborhood where he has lived, among his neighbors, for truth and veracity?

[Mr. Saxton objects to the question.]

Witness.—Not good; his character, generally, is decidedly bad; a man of no truth.

And being further examined on the part of the complainants, the witness further saith—Can't say I ever heard that he could not be believed under oath; I have had great dealings with him, and found him a man void of principle and truth; I once lent him $1250 to pay off a mortgage which one Whitenack had against his property; he gave me a bond and mortgage for the amount; he took the money and appropriated it to other purposes, never paying off Whitenack's mortgage, and I

lost the whole of it ; it was $1200 or $1250, I forget which ; this was while I lived in New Brunswick.

William Rake, a witness produced on the part of the defendant, being duly sworn, saith—I was sixty-four the 13th of last June; I have always lived in the county of Hunterdon, except three years, when I lived in the county of Philadelphia; I lived about 2½ miles from the farm where Williamson lived, until Williamson left the county, except about a year or so at the latter end of the time I lived at Flemington, about seven miles from him ; I was constable at Amwell seven years of that time.

What was and is the general reputation of Peter Williamson among his neighbors, for truth and veracity ?

Witness.—It stood very bad for both truth and honesty, and has done so ever since I first knew him, which was before he moved on the old homestead farm.

By agreement of counsel Mr. Rake states—I went yesterday to the burying-ground described yesterday by Peter Williamson, to see the gravestone of Micha De Hart ; I took a young man with me from Six Mile Run ; we found her gravestone, but the date of her death was not on it; I then went to the daughter of Micha De Hart, Sarah De Hart ; she produced an old Dutch Bible, which she said was the family Bible, containing the family record of births and deaths ; the old lady's death was there recorded ; it was 14th of March, 1790 ; I told her it was the grandmother of Peter Williamson I wanted to know about ; she said that was the lady.

And being cross-examined on the part of the complainants, the witness further saith;—I have heard something said against the character of Peter Williamson as a witness under oath ; he was called on a trial once at Sergeantville, and swore there to what the people of the neighborhood generally said they believed was not true ; I know of no other instance where his truth under oath was questioned ; don't recollect what he swore at Sergeantville.

Charles Bartles, a witness produced on the part of the defendant, being duly sworn, saith—The receipt I spoke of on my former examination, I think purported to be signed by William Williamson ; I don't recollect whether the name was signed

or a mark made; I did not know the handwriting; was not acquainted with the parties, and knew nothing about it; I don't know who signed as witness, nor whether it was genuine; all I knew about it was that there was such a paper; Abraham Williamson was a client of Col. Saxton's in another suit against Asher Williamson, at the time mentioned in my former examination; that was a suit in chancery, returnable April Term, 1825; there was also a proceeding on citation, issued out of Hunterdon Orphans' Court by Abraham Williamson against Asher Williamson, administrator of William Williamson, deceased, returnable February Term, 1825; my impression is, that there was a proceeding in Hunterdon Orphans' Court by Abraham Williamson, in which Mr. Saxton was his counsel, to revoke the letters of administration of Asher Williamson, administrator of William Williamson, deceased; don't recollect whether there was a decree revoking the letters or not; all the time which I mentioned on my former examination, during which Abraham Williamson was at the office of Col. Saxton, I think he was a client of Col. Saxton's.

And on a cross-examination on the part of the complainants, he further saith—I was not acquainted with the handwriting of William Williamson; I am still of the same opinion that I was on my former examination, that Abraham Williamson stole the receipt therein mentioned; I do not know what became of that chancery suit; I think Abraham did not prosecute either of the suits against Asher after the receipt was missing.

The counsel of the defendant presented a receipt from Mary Smock to Asher Williamson, administrator of William Williamson, deceased, dated September 30th, 1831, which was marked "Exhibit 6 for the defendant;" handwriting of Elisha Warford admitted.

Also a receipt from Thomas Bailey and Micha Bailey to Asher Williamson, administrator of William Williamson, dated September 28th, 1831, which was marked "Exhibit 7 for the defendant;" handwriting of Elisha Warford admitted.

Also a copy of the letter of administration granted in Kentucky to Perry Weakley, of Margaret Wilson, Samuel Williamson and Cornelius Williamson, which was marked "Exhibit 8 for the defendant."

Also a power of attorney from Perry Weakley, administrator of Margaret Wilson, to Abraham Williamson, which was marked "Exhibit 9 for the defendant."

Also a power of attorney from William Williamson and Richand Williamson to Abraham Williamson, which was marked "Exhibit 10 for the defendant."

Also a letter of administration granted to Abraham Williamson, in Kentucky, of the estate of William Williamson, deceased, which was marked "Exhibit 11 for the defendant."

Also a power of attorney from John Williamson, of Ohio, to Abraham Williamson, which was marked "Exhibit 12 for the defendant."

Also a certified copy of the letter of administration of William Williamson, deceased, granted in Scott county, Kentucky, to Abraham Williamson, which was marked "Exhibit 13 for the defendant."

Also an affidavit taken by John Williamson, in the State of Ohio, which was marked "Exhibit 14 for the defendant."

Also a power of attorney from Abraham Williamson to Joseph Williamson, which was marked "Exhibit 15 for the defendant."

April 14th, 1842, Joab Stout, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson, and have known him thirty years; he now resides about a mile and a half from my present residence, and has resided there, as I suppose, a dozen years; I cannot say particularly what is his character as a man of truth and veracity in the neighborhood where he resides; I had dealings with him, and we always came out right; I found him well enough; I should believe him under oath; I don't know anything to the contrary of his being believed under oath in his neighborhood.

And being cross-examined on the part of the defendant, saith—When I first knew Peter Williamson he lived somewhere about the Neshanic, about a dozen miles from me; I then had no particular acquaintance with him; I became more particularly acquainted with him during the last dozen years; he has often been at my house during this time, but I have never been in his house; I hired his boy once of him, and we settled, and had no difficulty about it, and I had no scruple but what he settled fair; I have had no other business transaction with him but

this; I don't think that I have ever heard his character for truth or veracity impeached; I should not object to him if I had a suit pending; his boy worked for me about a month; Williamson and I are very intimate and friendly; I frequently talked with him as he would be coming along by my house, but there has been very little visiting between us; I am a farmer, and hired the boy to work on the farm; I never knew of Williamson being sworn in a cause as a witness; I never heard any of his neighbors express any opinion, one way or the other, as to his being believed under oath.

Peter Snook, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson, and have known him twenty years; for a dozen years or more he has lived within a mile and a quarter from my residence; our land is about two or three hundred yards apart; I know nothing of his character for truth and veracity in his neighborhood but what is right; he would make promises sometimes which he would not perform, but that is common; I have had dealings with him for twenty years, off and on, and when he got the money he would pay it; I know nothing of him but what was honest.

And being cross-examined on the part of the defendant, saith— I follow milling; not now myself, but my son does, but I have followed it these forty years; my principal dealings with Williamson have been for grain and flour, at the mill; I have had other dealings with him, but I cannot recollect what they were, exactly; we were very intimate as neighbors; he is frequently at my house, and I at his; when I spoke of his not performing his promises, I meant his promises to pay money for things he had got; he never disputed his account; I never heard any of his neighbors impeach his honesty, truth or veracity; I don't recollect that I ever heard any of his neighbors talk on the subject of his being a man of truth or not; I don't know of there being any reports in the neighborhood about him as a man of truth; I can remember better what happened thirty years ago and more than what happened lately.

I had dealings with Williamson before he moved where he now lives; that is the reason why I came to know him so well; I never knew him to be examined as a witness in a cause in

court; I never heard his character discussed in any way in his neighborhood.

Andrew Stillwell, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson; have been particularly acquainted with him for thirty years; more particularly for the last twenty years; for the last twelve years our premises joined, but for two or three years of this time Williamson did not live on these premises; this was in the township of Amwell; I moved from there the fifth of April instant, to the city of Trenton; I believe the character of Williamson in the neighborhood where he lives stands pretty fair; I know nothing against it.

And being cross-examined on the part of the defendant, saith— Williamson's dwelling-house was about half a mile from mine; Williamson and I are on intimate terms as neighbors; have always been friendly; he was very frequently at my house, and I have often been at his; we have had considerable business transactions together.

And being again examined-in-chief on the part of the complainants, saith—I have heard the character of Williamson, as to truth and veracity, talked about since the service of the subpœnas in this cause—talked about by his present neighbors; his character was favorably spoken of, and it seemed to be a matter of surprise that his character was brought in question; I have never heard anything said against his character in his neighborhood, for truth and veracity, in anything serious; I have never heard his character for truth and veracity questioned till this suit; I may have heard some things said against his character in jest; very few escape this; I cannot state what I have heard said against him, even in jest, but have heard him talked about; think I have heard him lightly spoken of in jest but cannot say when, or by whom; have never heard his word brought seriously in question.

And being again cross-examined on the part of the defendant, saith—When I have heard him spoken of in jest it would be his endeavoring to excite levity and merriment; when people spoke of him thus, I suppose they spoke as they thought; believe this is the only way in which I have ever heard his moral character lightly spoken of; believe I have never heard any

reports in his neighborhood affecting his moral character; his want of punctuality in his payments I have heard talked of; can't tell all of the neighbors that have expressed surprise since the service of the subpœnas in this cause, at his veracity being questioned; I have heard my nearest neighbors, Andrew H. Quick, William Bodine, Jacob Reed, of New Market, a mile from Williamson's; Benjamin Price, of the same place; David Larew, also of the same place, a married man about 23 or 24 years of age; William Young, near Snyder Town—all these, and I think several others, whose names I cannot now recollect, I have heard express surprise at his character for truth being questioned, and we all agreed that we would be willing to take his oath; Samuel Larew, the father of David Larew, also expressed the same opinion; I was subpœnaed last fall in this cause, and it is since that time I have heard these persons speak of Williamson as above stated; the conversation was introduced in consequence of the service of the subpœnas, but can't state particularly how the conversation was brought about; I suppose it was known that Williamson's veracity was brought in question because of the service of the subpœnas; the subpœnas did not state anything about his veracity; William H. Johnson, one of the complainants, served the subpœnas, and stated that he wanted witnesses to sustain the character of Williamson; this, Johnson told me, when he served a subpœna on me.

Daniel Larew, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson; have known him as long as I have known any one—about 45 or 46 years; lived in the same neighborhood with him about 25 or 26 years; he moved out of this neighborhood more than twenty years ago; during his residence there I never heard anything contrary to his being a man of truth and veracity; since that period I know nothing against his character for truth and veracity.

And being cross-examined on the part of the defendant, saith— I don't recollect where Williamson moved to after he left my neighborhood; for a few years after he left my neighborhood, I saw him frequently, but have not seen him often for several years last past—perhaps two or three times for the last twelve years; when he lived in my neighborhood, I don't know that

I ever heard his character for truth and veracity talked about; don't know as I have heard his name mentioned for several years back; I might have known him to be sworn as a witness in a cause, but don't now recollect.

Uriah Sutton, a witness produced on the part of the complainants, saith—Peter Williamson lived in my neighborhood, about three miles off; he lived there when I first remember, and moved away between twenty and thirty years ago; I was personally acquainted with him, but not very intimate; there was not a great deal of intercourse between us; we were friendly when we met; don't recollect ever hearing his character for truth and veracity scrupled at that time in the neighborhood; don't recollect ever hearing it brought in question, or hearing anything about it; know nothing about it of my own knowledge; think Uriah Bonum died in the spring of 1809.

William Young, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson; have been acquainted with him about thirty-five years; I now live about a mile and a half from him, and have so lived for about twelve years past; before this, he lived about a mile further up in the mountain, in the neighborhood; he has lived in the neighborhood about fifteen years, more or less; his character stands about like the commonalty of people; I have heard nothing against it, for my part; never heard anything against his character for truth and veracity before he came into this neighborhood.

And being cross-examined on the part of the defendant, saith—I never heard anything in the neighborhood, one way or the other, about his character for truth and veracity; he and I are on intimate terms as neighbors.

Andrew H. Quick, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson; have been acquainted with him for about twenty years; live within three-quarters of a mile from him, and have so lived for about ten or twelve years last past; for one or two of the twenty years spoken of, he lived out of the neighborhood—for the rest of the time, in it; I don't know but what his character for truth and veracity in my neighborhood is good; have never heard it condemned; don't know that I

ever heard anything against his character for truth and veracity before or since he has been in my neighborhood.

And being cross examined on the part of the defendant, saith —I have never heard his character for truth and veracity brought in question one way or the other, till these subpœnas were served in this cause; William H. Johnson, one of the complainants, served a subpœna on me, and said he wanted me to prove the veracity of Peter Williamson; have had a little dealing with Peter Williamson; not a great deal; he has had grain and flour of me sometimes; he and I are on intimate terms; not visiting often; he frequently calls at my house, and I have been often at his; I am not quite thirty-nine years of age.

And being again examined-in-chief on the part of the complainants, saith—Since the service of the subpœnas in this cause I have heard nothing against his character for truth and veracity.

Jacob Reed, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Peter Williamson; have known him for the last fifteen years; I live about a mile from him, and have so lived for the last ten or twelve years; had some little acquaintance with him before he came to my neighborhood; don't know but what his character for truth and veracity stand fair as far as I know or have heard; have heard nothing said against his character for truth and veracity till after the subpœnas were served; since their service I have heard nothing said against his character for truth and veracity; have never heard that his character for truth and veracity was ever questioned in any other case than in this cause.

And being cross-examined on the part of the defendant, saith —Mr. Johnson, one of the complainants in this cause, told me that his truth and veracity was impeached when he subpœnaed me; Williamson and I are on friendly and intimate terms.

Philip Rake, a witness produced on the part of the complainants, being duly sworn, saith—I am acquainted with Asher Williamson, the defendant in this cause; have been acquainted with him thirty or forty years; Cornelius Williamson and I were securities on his bond as administrator of William Williamson, deceased; he came to my house one day and wanted me to go with him to the surrogate's office to be one of his securities as above; I told him it likely would not be settled

in a great while, and I did not like it much ; he said he did not know as it would make a great deal of difference, for he would soon settle it up ; I asked him what amount of estate there would be ; he said he did not· think there would be over four or five hundred dollars—it might reach five ; so I went up with him and became one of his securities, as stated ; I was acquainted with Abraham Williamson, said to be the son of William Williamson, deceased ; he came to this state about the year 1825 ; he said he came from Kentucky ; I heard Asher Williamson, the defendant, say there was not more than three, four or five hundred dollars coming to this Abraham Williamson, from Kentucky, if he, the said Abraham Williamson, would settle right, and that he need not make such a fuss about it ; when Asher said there would not be more than three, four or five hundred dollars coming to Abraham Williamson, I did not know whether he meant the share coming to Abraham or to all the heirs of William Williamson, deceased ; nothing was said about that ; the three, four or five hundred dollars spoken of by Asher Williamson to me, I took to be coming from the estate of William Williamson, deceased, and that this would settle the whole estate, but I can't say that Asher said so.

Question by the counsel for the complainants.—"Had you any conversation with Abraham Williamson about the existence of a receipt given by his father, William Williamson, to Samuel Williamson, executor of William Williamson the elder, deceased ?" [This question objected to by the counsel for the defendant.] Witness answers that, on a certain occasion, Abraham Williamson called on me to go with him to Mr. Saxton's office, and said he would show me the amount he demanded ; I went up with him, and as we were going along he said if that devilish receipt was out of the way, he would then recover a large sum of money ; in a few days, or a week, afterwards, he called at my house and said that that receipt was gone, and now he could recover a large sum of money ; Asher Williamson and I once talked about this receipt, and he said if there was such a receipt, it was a forged one, and he thought Peter Williamson had forged it, or helped do it, anyhow ; this conversation with Asher, I think, took place after Abraham Williamson told me the receipt was gone.

And being cross-examined on the part of the defendant, saith —I can't say where Asher and I were when he talked about the receipt; I don't know that Abraham Williamson was a son of William Williamson, or whose son he was; I don't know what accounts there were to settle between Asher and Abraham Williamson; my wife was present when Abraham Williamson told me that the devilish receipt was gone; think I went to the surrogate's office to be security for Asher, as the administrator of William Williamson, the day after he spoke to me to go there; think he called for me, and we all went up together; there was no one present but my wife, when Asher spoke to me to be his security; don't know that Asher told me, at this time, that he did not know what the amount of the estate would be; think we gave bond in $2000; I have never been called on to pay anything as security for Asher.

William Stout, a witness produced on the part of the defendant, being duly sworn, saith—I have lived all my life, in the old township of Amwell, including, now, the townships of Delaware and Raritan; I am now in my 62d year; for thirty years past, I have followed farming; previous to that, blacksmithing; I hold now, the commission of justice of the peace for this county; have held the office of justice of the peace between fourteen and fifteen years, and that of judge, four or five years; I am acquainted with Peter Williamson, spoken of by the preceding witness; have known him between forty and fifty years —perhaps forty-five years; lived two miles and a quarter from him, for six years, and, while I thus lived, did his work for him, as a blacksmith, and had an opportunity of seing him two or three times a week; I then lived in the present township of Delaware; during this time, I was intimately acquainted with him; this was from 1803 to 1809; after this time, I moved to my present residence, in Amwell, and he to Somerset county, and our intimate acquaintance ceased; since that time, we have seen each other occasionally; when we lived in the same neighborhood together, he was not considered, at that time, a man that stuck strictly to the truth; it is a pretty hard question to solve; I do not think he always told me the truth.

His brother William told me he did not know when to believe him; that he was a man that would leave the truth;

that he was his brother, and he was sorry to say it. [Objected to.]

I did a good deal of work for him, during these six years; his reputation for truth and veracity, in his neighborhood, was not the first; it was bad; he was considered a man not to be believed at all times; I know nothing about his being believed under oath; never recollect of being where he was called as a witness, and know nothing of his reputation in this respect; never heard any one say, as I recollect, that he was not to be believed under oath.

And being cross-examined on the part of the complainants, saith—I reside from Peter Williamson, at this time, about three and a half or four miles; don't hear but what his character, in the neighborhood where he now resides, is fair, though I don't hear much about him; I have had very little knowledge of him, lately, and don't know that I have seen him for five or six years; as an instance of his not being a man of truth, in his former neighborhood, he would tell you of certain performances which would never come to pass; he would never perform; he would tell what he had done, which he had not done, and promised to do other things, which he did not do; he was lively in his disposition, too, and loved to tell a good story, and make people laugh; when I worked for him, he said he would pay me at such a time, &c., but he never did, and when I broke up shop, he disappointed me as to the times of payment for my work; he came and settled the account with me, honorably and fairly, but did not pay the money, and afterwards settled with the constable, at my suit; I have frequently heard it said, in the neighborhood, that he was not to be believed—that he made promises to pay money, and would lie people out of it; I mean by this, that he made promises to pay, and would not perform them; I mean that he did not pay at the times he promised; in the neighborhood, when anything was told, and it was said that Peter Williamson told it, it was not believed; this was when I was in intimate habits with the man; I can't say how it is now; I hope he does better; the stories I refer to, were of matters that were said to have taken place among young people at his singing-school.

And being examined-in-chief, on the part of the defendant,

saith—He would not have been believed in the neighborhood as to any matter, the truth of which depended on his word alone; I can't say that this reputation of his extended to any serious matters of business; I don't know of any matter of business in which he would have been believed by me or the neighbors; he might have been believed in business of importance; I can't say whether he would or not; I never knew him tried in the important matters to which I now allude.

And being again cross-examined on the part of the complainants, saith—I never heard of his reputation that if called as a witness under his solemn oath, he was not to be believed; it would depend on circumstances whether he was to be believed, in his account of a settlement between two neighbors, at which he was present; some men might have a better opinion of him than others and might believe him; I don't know whether or not it would be believed in general; it might be believed by some persons, and might not by others.

And being again examined-in-chief on the part of the defendant, saith—In what I have said of Peter Williamson's reputation, I speak of his immediate neighborhood at that time; I never heard any reputation about him at all, one way or the other, as a witness under oath, and I give no opinion myself as to his reputation under oath.

May 25th, 1842, Cornelius Lake, a witness produced on the part of the complainants, being duly sworn, saith—I had formerly some knowledge of William Williamson, the brother of old Samuel Williamson; I was small when I was acquainted with him; he lived near my father; while I was a boy he moved to the western country; he afterwards came back to this country, but I can't state the time within ten years, that I know of; I recollect the time when the Williamson farm was set up for sale; I mean the farm that was owned by the father of William Williamson; I don't recollect the name of the father of William Williamson; I am not right certain whether William Williamson came back to this country before or after the sale of the Williamson farm, but it rather strikes me it was after the sale; I don't think I had any conversation with William Williamson when he came back, but I saw him at old Mrs. Arnwine's: I heard old Mrs. Arnwine and William William-

son talk about his father's estate; he was stating to her that his brother, Samuel Williamson, had offered him between 40 and 50 shillings per acre for his share; Mrs. Arnwine said she would not take it, for it was worth more; he said if he lived here he would not take it, but that the expense of coming here and a lawsuit would be so much that he did not know but what it would be as much profit for him to take it as to leave it; I don't recollect of anything else being said about the property; I don't remember of seeing William Williamson but at this one time; I don't recollect how long he remained in this country at that time; I might have seen him afterwards, but I don't recollect.

And being cross-examined on the part of the defendant, saith— I did not understand from what William Williamson said whether he would or would not positively accept of his brother Samuel's offer; I never saw him in New Jersey after this time; William Williamson did not say whether he would or would not accept of his brother Samuel's offer further than I have stated; he said nothing about it one way or the other, more than I have stated.

November 22d, 1842, Daniel Larue, a witness produced on the part of the complainants, being duly sworn, saith—I went to the western country with Asher Williamson, the defendant in this cause, in the fall of the year 1811; at this time I went with him to the house of his uncle, John Williamson; his uncle, John Williamson, lived at this time in the State of Ohio, within twenty miles of a place called New Lancaster; I am connected with the Williamson family; my grandmother was a sister of the father of defendant; in a conversation between the defendant and his uncle John, at the time spoken of, defendant proposed to his uncle John to buy his (John's) share of his father, William Williamson's, estate; this share was considered to be in the State of New Jersey; I did not hear defendant make any other offer for this share than $40; defendant told his uncle John that there was something coming to him, but did not know how much; that he would be willing to give him $40 at a venture for it; that there would have to be a contention for it, considerable trouble and expense, but that he would venture to give him $40 for it; John Williamson

Williamson v. Adm'rs of Johnson.

hesitated a while about taking it—said there was considerable coming, but he did not know how he should get it; he finally concluded to take it; this was a few days before we came away; John Williamson came on with us as far as his son John's, where the writings were executed; there was no contention about John Williamson's share of his father, William Williamson's, estate, at this time; I believe the lawsuit was pretty much ended at this time; I recollect William Williamson, the brother of John Williamson, being in the State of New Jersey, from the State of Virginia, about fifty years ago; I have frequently heard the Williamson family speak of William Williamson's being here, as I have stated; I recollect seeing Abraham Williamson here about the year 1827; this Abraham Williamson was the son of William Williamson, the brother of John, and came from the State of Kentucky; heard Abraham Williamson say, when he was here, that there was a receipt from his father William, to Benjamin Johnson, for a part of his share of his father, William Williamson's, estate; I am unable to say, with certainty, who this receipt was from, or to whom it was given, but that it was in favor of Benjamin Johnson, and was in the hands of Mr. Saxton, and that he had destroyed it; have heard Abraham Williamson tell this story very frequently.

Othniel Lake, a witness produced on the part of the complainants, being duly sworn, saith—My grandmother and defendant's father were brother and sister.

The complainants here offer evidence of the declarations of defendant's father, defendant himself, his brothers and himself, and it is excepted to, so far as relates to the declarations of defendant's father and brothers.

Witness says it was always a talk amongst defendant and his father and brothers, that Samuel Williamson, from the proceeds of the first sale, had paid to the boys one hundred, and to the girls, fifty pounds, except Cornelius, who, it was said, would not receive anything; I mean the proceeds of the sale of the old homestead of William Williamson, the father of William and Samuel Williamson; it was also talked that receipts had been given for these shares; after this suit was brought, I heard the defendant say that these receipts ought to have been brought in before, when they settled; among the receipts there

was one talked of for £100 given by William to Samuel Williamson; after the death of Cornelius Williamson, the father of defendant, the receipt last spoken of was talked about, and I have heard it talked of scores of times; I can't say how soon after the death of Cornelius Williamson I first heard this receipt talked about—it might have been ten years or two years; I had heard of this receipt before this suit was brought; I can't say, positively, that I ever heard defendant say anything about this receipt till after the suit was brought, and I can't say that I did not; I don't recollect that I have ever heard defendant say anything about the payment of £100 by Samuel Williamson to William Williamson; I have heard defendant's brother William speak about it, and I don't doubt I have heard defendant speak about it, but I can't recollect; it was always talked of so amongst the family; I never heard it denied; shortly after the death of defendant's father, there was a good deal of talk between my family and defendant's about the payments to the heirs of old William Williamson's estate.—I mean about the payments of £100 to the boys, and £50 to the girls; Abraham Williamson, the son of William Williamson the younger, was here from the State of Kentucky, a year or two before the court-house in this county was burned in 1826–27; he said he was here to receive his father William's share of his grandfather William Williamson's estate, and he said he had a power of attorney for the purpose, and that he was the administrator in Kentucky of his father's estate; he said that his father had received £100 of his brother, Samuel Williamson, of the estate of William Williamson the elder, and had given a receipt for it; and he said he would deduct this out of his father's share, and settle with defendant; the suit was then pending between Benjamin Johnson and defendant; in a conversation between Abraham Williamson and Benjamin Johnson, Abraham Williamson said, my father has received the £100 from Samuel Williamson, and has given a receipt for it, and he was willing to deduct that out of his father's share; Johnson said it was more than £100; Williamson said it was but £100, as he had always understood from his father, and the receipt would speak for itself; some three or four months after this, Abraham Williamson came to my house, and in conversation said, Mr. Johnson

has lost his claim now, but if you and I were in Flemington behind Bonnell's big shed, under a big stone, I could show you a paper that would tell all about it; I understood him to refer to this receipt; I remarked to him that whether he had got this receipt honestly or dishonestly he ought to tell no man, for he might get into a deal of trouble by it; I never before this time heard that this receipt was lost; I never heard its existence denied till after this; he would sometimes say that Mr. Bartles had destroyed it, and sometimes that Mr. Saxton had destroyed it, and that Mr. Saxton would accuse Mr. Bartles of selling it.

And being cross-examined on the part of the defendant, says— His wife and children were present during the conversation of Abraham Williamson at his house, as he has stated; when I told him that he ought not to tell any man about the receipt, he made no reply; I recollect of hearing William Williamson, brother of defendant, talk about the payment aforesaid, to the heirs of William Williamson, and I don't recollect distinctly of hearing any other one of the family talk about it, but I have no doubt I have heard defendant talk about it, and I have never heard it denied; I have heard defendant say, since the suit was brought, that if there was such a paper it ought to have been produced at the time of the settlement; I don't recollect of ever hearing defendant say anything else than this about this payment or receipt; I have heard William, defendant's brother, talk about it, at my father's office; I think that Cornelius Williamson, the father of the defendant, died more than thirty years ago; I might have been fifteen years old at the time; I shall be fifty-one years of age the 19th January next; for aught I know, defendant and I are on friendly terms; I believe we generally speak when we meet; some years ago we had some disputes, and we had a trial at law, and I don't know whether it is settled yet or not; we have not had much intercourse since this dispute; I don't recollect distinctly of ever hearing Cornelius Williamson, the father of the defendant, talk about the payment to William Williamson and the receipt for £100, but heard him say the heirs were all paid but him, and he would not have any if he could not get more; I don't recollect particularly of hearing any of defendant's brothers besides William talk about this payment or receipt; I have heard Wil-

liam talk about it more than any of the rest; I never heard William say that he knew of his own knowledge that such a receipt had been given by his uncle William ; I don't mean to say that I ever heard any of the family say that they knew that such a receipt had been given ; I have heard my grandmother talk more about it than anybody else; I never heard Abraham Williamson deny that such a receipt had been given by his father, but after he told me the story about the stone behind Bonnell's shed, he said if they had such a receipt, let them produce it.

In April, 1843, the cause was heard in the Court of Chancery, before William Pennington, Chancellor, and in July, 1843, an interlocutory decree was made as follows : " It appearing to the court that Samuel Williamson, the executor of William Williamson the elder, deceased, in the pleadings in this case mentioned, on the 2d day of April, 1792, paid to William Williamson the younger, in the pleadings also mentioned, the sum of £131 10s. for his share of the proceeds of the first sale of the real estate of the said William Williamson the elder, deceased, made by the said Samuel Williamson, deceased, as in the pleadings mentioned, for which said payment a receipt and acquittance, bearing date on that day, was made and given by the said William Williamson the younger, to the said Samuel Williamson, executor as aforesaid, as in the pleadings mentioned. And it further appearing to the court that the said judgment recovered in the Supreme Court of this state, on the 27th day of February, in the year of our Lord 1822, in the name of William S. Pennington, late governor, &c., to the use of Asher Williamson, as administrator of William Williamson the younger, deceased, against Benjamin Johnson, as survivor of the said Samuel Williamson, deceased, as in the pleadings likewise mentioned, was for too much money, and that the said defendant in that action was entitled to be credited for the said payment made by the said Samuel Williamson, executor of the said William Williamson the elder, deceased, to the said William Williamson the younger, on the 2d day of April, in the year of our Lord 1792, on the first sale of the property of William Williamson the elder, deceased, made by the said Samuel Williamson, executor. And the Chancellor being of opinion that the complainants in this case are entitled to the relief prayed against

Williamson v. Adm'rs of Johnson.

the said Asher Williamson. It is, thereupon, on this twelfth day of July, in the year of our Lord 1843, by William Pennington, esquire, Governor and Chancellor of the State of New Jersey, ordered, adjudged, and decreed that it be referred to James N. Reading, esquire, one of the masters of this court, to take an account, and ascertain the sum actually due from the said Benjamin Johnson, as survivor of the said Samuel Williamson, deceased, to the said Asher Williamson, as administrator of the said William Williamson the younger, deceased, at the time of the said judgment obtained by the said William S. Pennington, late governor, &c., against the said Benjamin Johnson, after crediting the payment so made by the said Samuel Williamson, as executor as aforesaid, to the said William Williamson the younger, on the 2d day of April, in the year of our Lord 1792, above mentioned, and ascertain the excess of the said judgment over the amount so due at that time; and that the said master do compute interest on the amount of said excess, from the time of rendering said judgment, up to the date of his report; and that he make report to this court with all convenient speed; and all further equity and directions are reserved. In making his calculation, the master will deduct from the said judgment only the credit aforesaid, of the 2d of April, 1792, with interest to be computed from that date, on the same, at the rates of interest allowed, during the time, by the laws of this state, and will report, distinctly, what the aforesaid credit, with the interest thereon, amounts to, up to the date of the report."

On the 3d October, 1843, James N. Reading, master, reported the amount due to the complainants, on that day, to be $2256.27, as by his schedule annexed to said report, to wit:

The proportion of share of moneys arising from the second sale, and net rents of the premises in the pleadings mentioned, payable to William Williamson, Jr., under the will of William Williamson, Sr., deceased, $1,744 88

Amount paid by Samuel Williamson, executor, to William Williamson, Jr., out of the proceeds of the first sale, the 2d April, 1792, £131 10s., equal to...................... $350 66

Interest thereon, from 2d April, 1792, to the time Samuel Williamson received the

balance of moneys arising from the second
sale and net rents, out of the Court of Chan-
cery, 25th June, 1814, and gave bond—22y.,
2m. and 23d......... ...... ...... ...... ...... ...... $545 67

                                                              $896 33

Balance then due William Williamson, Jr........... $848 55
    Interest from 25th June, 1814, to 27th February,
1822, the date of the judgment by William S. Pen-
nington, governor, &c., against Benjamin Johnson,
survivor, &c........ ...................... ...... ...... ...... ...... 455 70

                                                          $1,304 26
    Deducting that sum from amount of said judgment,
27th February, 1822, exclusive of costs, which was.... 2,202 46

    Leaves a balance or excess of said judgment, over
the amount actually due Asher Williamson, adminis-
trator of William Williamson, Jr ......... ......... ...... 898 20
    Interest thereon, from 27th February, 1822, to 3d
October, 1843—21y., 7m. and 6d ......... ............... 1,358 07

    Amount due from defendant to complainants....... $2,256 27
    On the 13th of October, 1843, at a Court of Chancery held at
Trenton, by William Pennington, esquire, Governor and Chan-
cellor, it was "ordered, adjudged, and decreed that the said
report, and all matters and things therein contained, be con-
firmed, and that the said defendant, Asher Williamson, do pay to
the said complainants, William H. Johnson and John T. Neely,
administrators of the said Benjamin Johnson, deceased, the said
sum of $2256.27, so reported to be due from him to them,
together with lawful interest thereon, from the said 3d day of
October, instant (1843), being the date of the said master's report.
until paid, and that the said complainants have execution there-
of by writ of *fieri facias* against the goods and chattels, lands,
tenements, hereditaments, and real estate of the said defendant.
And it is further ordered, adjudged, and decreed that the former
decree of this court, made in this cause on the 16th October,
1839, and the lien thereof on the property of the said defendant,
subject thereto, stand and remain in force, to secure payment of
the debt and interest aforesaid, and that the sheriff, or other
officer to whom the said writ of execution shall be directed, be

therein commanded, that of the goods and chattels in his county of the said Asher Williamson, he cause to be made the debt and interest aforesaid. And if sufficient goods and chattels of the said Asher Williamson cannot be found in his county, that then he cause the whole or the residue, as the case may require, of the said debt and interest to be made of the lands, tenements, hereditaments and real estate whereof the said Asher William-son was seized on the said 16th of October, 1839, or at any time afterwards, in whose hands soever the same may then be."

From this decree the said Asher Williamson appealed to the Court of Errors and Appeals, stating in his petition of ap-peal that he finds himself aggrieved by a final decree made in the Court of Chancery, by His Excellency William Pennington, Governor and Chancellor of New Jersey, bearing date the 13th day of October, in the year of our Lord 1843, wherein the said William H. Johnson and John T. Neely, administrators, &c., of Benjamin Johnson, deceased, were complainants, and Asher Williamson, defendant, in this respect, to wit, that the said decree adjudged that the said Asher Williamson, the petitioner, do pay unto the said complainants, William H. Johnson and John T. Neely, administrators, &c., of Benjamin Johnson, de-ceased, the sum of $2256.27, with interest thereon from the 3d day of October, in the year last aforesaid. And appealing from the said decree, upon the ground that the same is errone-ous, for that the petitioner is not indebted to the said complain-ants in the said sum, or any part thereof, nor was he in any manner or way liable to the said complainants for the said sum of money, or any part thereof.

The cause was argued by

*G. D. Wall* and *P. D. Vroom*, for the appellant.

*W. Halsted*, for the respondents.

Cases cited by the counsel for the appellant. 6 *Johns. Ch. R.* 90 ; 1 *Ibid.* 51, 406 ; 3 *Ibid.* 351, 356 ; 1 *Johns. Ca.* 436 ; 6 *Wheat.* 109, 113 ; *Saxton* 29, 113 ; *Elm. Dig.* 3, *No.* 8 ; 6 *Johns. Ch.* 479, 481 ; 1 *Sch. and Lef.* 201 ; 1 *Johns. Ch.* 323 ; 7 *Cranch* 336.

Cases cited by the counsel for the respondents. 1 *Spencer's Rep.* 214; 1 *Green's Ch.* 40; 5 *Hal. Rep.* 276, 277; 4 *Ibid.* 411; 1 *Mod.* 6; *Gould's Pl.* 152, 153; *Willes* 366; 4 *Johns. Rep.* 536; *Prec. in Ch.* 233; 4 *Price's Exch.* 136, 140, 126; 1 *Ves.* 289; 2 *Ves., Jr.*, 132, 135; 3 *Atk.* 224, 234; 2 *P. Wms.* 424, 426; 2 *Story's Eq.*, § 879; 1 *Wash. C. C. Rep.* 320; 2 *Hayw.* 342, 269; 1 *Dess.* 172; 4 *Ibid.* 176; 7 *Term Rep.* 269.

THE CHIEF JUSTICE delivered the following opinion :

It appears by the state of the case in this cause, (consisting of 155 closely-printed octavo pages,) that William Williamson the elder died seized and possessed of certain real estate, in this state, sometime in the year 1765, having first made and executed his will, by which he gave to his wife the use of all his estate, real and personal, during her widowhood, and after her death or marriage, directed his executors to take the same in possession and dispose of the same; that within two years after such event they should sell the lands; that out of the moneys arising from such sale, the executors, in three years thereafter, should pay certain legacies to his two daughters, and divide the residue equally among his five sons, Cornelius, Samuel, John, William and Abraham, and his two daughters, Micha and Margaret, except that Abraham should have £100 more than the rest; and appointed his sons Cornelius and Samuel his executors. That the widow lived on the premises until she died, which was in December, 1787. Cornelius, the oldest son, never proved the will, but Samuel did prove the same, on the 16th June, 1774. That on the 11th March, 1789, two years after the death of his mother, Samuel offered the farm for sale at auction, having given previous notice of such sale; that Cornelius and several of the brothers were there, but refused to bid; that Samuel directed his own son Cornelius to bid, and he did bid, for the farm, forty-two shillings the acre. Samuel, the executor, did not then strike it off; but, for want of a better offer, on the 9th of August, 1792, he conveyed the farm to his said son Cornelius, who, soon after, re-conveyed the farm to his father, Samuel. That the farm, according to the ancient deeds, contained only 290 acres, but upon a re-survey was found to

contain about 90 or 100 acres more. That the testator's son Cornelius took possession of the excess, claiming it as heir-at-law. That Samuel Williamson, the executor, paid the legacies; that his brother Abraham had died intestate and without issue; and that on the 2d April, 1792, he divided the residue of the amount of sale of the said farm, at forty-two shillings an acre, into four equal parts, being £127 5s. each; and having retained one share for himself, he, on that day, paid to his brother, William Williamson, £131 10s. for his share, and took his receipt and acquittance therefor in full. That on the 30th September, 1793, he paid his brother John in part, and on the 3d of October, he paid him the balance, and took his receipt; and that he afterwards, as he alleges, settled with his brother Cornelius for his share, leaving the dispute about the surplus land unsettled. That the said Cornelius afterwards died, leaving a will, and leaving six children, viz., William, Cornelius, Asher, Joseph, Bernice, Patience and Micha. It further appears that on the 20th November, 1809, the said children of Cornelius, the brother of Samuel, filed a bill against Samuel, to set aside the sale made by him, and for an account. The case recites this bill, and the answer of Samuel to the same, which was put in on the 10th July, 1810, and the proceedings thereon; by which it appears that on the 11th of September, 1811, Chancellor Bloomfield decreed that the sale by Samuel was fraudulent and void; that the whole farm should be re-sold by him, under the direction of a master; that the sale should be reported to the court, and the proceeds should be brought into court; that the master should take an account of rents and profits from the 11th March, 1789, when Samuel took possession under his own sale, &c. That on the 24th October, 1812, the master reported that the rents and profits which ought to be charged to Samuel, amounted to $2760; and that he ought to be allowed for improvements, $505. Exceptions were filed by Samuel to this report, in March Term, 1813. On the —— day of ——, A. D. ——, Samuel Williamson, under the direction of the master, sold the entire farm for the sum of $7923.31; which being brought into court, the cause came on to be heard before Chancellor Ogden, upon the equity reserved, in September, 1813; and on the 22d October, 1813, the Chancellor made a

decree that the master should pay, out of the moneys in court, to the representatives of Cornelius, the son of the testator, William Williamson the elder, the one-fifth part of the sum of $10,178.21, the aggregate amount of the sales last aforesaid, and of the rents and profits reported by the master, after deducting therefrom £100 given to the two daughters, and £100 given by the testator to his son Abraham, with interest from 1792, when those legacies were paid by Samuel, and after deducting also $173.80 for the master's fees ; and that the master should pay over the residue, after deducting the complainant's costs, to the said Samuel, to be by him disposed of according to the will of his father, upon his giving bond with security, &c.  A re-hearing was then moved for and granted.  It took place in June, 1814, before William S. Pennington, Chancellor, who, on the 11th June, 1814, decreed that the sum of $523.33, which had been allowed to Samuel for money paid to his brother Cornelius as his share of the proceeds of the first sale, should be stricken out, so as to increase the sum due to Cornelius by that amount, and make it $1744.88 instead of $1221.55 ; and confirmed the decree in all other respects.

By the decree of William S. Pennington, Chancellor, made in June Term, 1814, the share of William Williamson was fixed at $1744.88.  For this sum, with interest from the date of that decree, Asher Williamson, as administrator of William Williamson, recovered judgment against Benjamin Johnson, and raised the whole amount on execution.

By the decree of William Pennington, Chancellor, the above sum was too much by the amount of £131 10s. paid by Samuel Williamson to William Williamson on the 2d April, 1792, with interest thereon from that time to the 25th June, 1814, the date of the decree of the first Chancellor Pennington.

The account will then stand thus :

25th June, 1814. . Amount of share then decreed to
be due William Williamson ........................... $1,744 88
Deduct from that, 1st, £131 10s., equal to.....$350 66
Interest at 7 per cent. from 2d April, 1792,
to 25th June, 1814, 22y., 2m. 23d............545 67
                                                               896 33

Shows the decree was too much by...................... $848 55

As, therefore, Asher Williamson, as administrator of William Williamson, sued for and received of Benjamin Johnson $848.55 too much, with interest from the 25th June, 1814, Johnson is entitled to recover back that sum, with interest from that time to the 3d October, 1843, the date of master Reading's report. The account will then stand thus—

Amount of excess decreed by Chancellor William S. Pennington, the 25th June, 1814, as William Williamson's share ......... ..................... ......... ...... $896 33

Interest, at 7 per cent., from 25th June, 1814, till 4th July, 1824, (when interest was reduced to 6 per cent.,) 10 years, 21 days ......... ...... ........... ............ 622 15

Interest from 4th July, 1824, at 6 per cent., to 3d October, 1843, the date of master Reading's report, 19 years and 3 months ...... ............ ...... ............ ... 1183 92

$2602 45

That there once existed a receipt or acquittance, in writing, from William Williamson to Samuel Williamson, for £131 10s., bearing date the 2d April, 1792, I am entirely convinced. It is established beyond all doubt, by the testimony of Mr. Saxton and Mr. Bartles. Their testimony was given at a time when the facts and circumstances stated by them must have been fresh in their memory.

That that writing was surreptitiously abstracted from the office of Mr. Saxton, I am fully convinced; at any rate, it has been destroyed or lost, beyond recovery, and therefore its non-production fully accounted for. I am equally well satisfied it was genuine, and not a forged or spurious instrument; and, if so, we are bound to believe that the money mentioned in it was actually paid by Samuel Williamson, according to the tenor of the writing.

It is admitted by the defendant—at least it cannot be denied, for the record proves it—that he obtained a judgment against Johnson for the whole amount of William Williamson's share of his father's estate, without any allowance for this disputed payment. It is equally true that the defendant obtained the whole amount of that judgment, with interest and costs, by a sale, under execution, of what (at least between him and Johnson) was Johnson's property.

It follows, then, that the defendant actually received, as administrator of his uncle, William Williamson, £131 10s. more than he ought to have done, with interest upon it from the time it became due from his uncle Samuel to his uncle William Williamson, up to the date of the judgment, with interest, again, upon the aggregate amount from that time until he received the money from the sheriff; and, consequently, that the defendant, in fact and in conscience, now owes to Johnson the sum of £131 10s., with such accumulated interest upon it.

Johnson now seeks to recover back this money; and conscience at once asks, why should he not? The answer to this question has been given us in the shape of various objections, which have been taken and pressed with great learning and ability by the defendant's counsel.

Before I proceed, however, to consider these objections, I cannot refrain from noticing the fact that, for all that appears, the defendant has the money yet, or has applied it to his own use; at least I see no evidence on the record that he has ever paid one dollar of it to the children of William Williamson. If so, he may, in a court of equity, be fairly considered, as to this excess of payment, a trustee for Johnson; and if he pays it to him under the direction of the Chancellor, he is in no danger of being compelled to pay it over again to the children of his intestate, William Williamson.

Nevertheless, this court cannot affirm this decree, and compel the defendant to pay back the money to Johnson, unless we can do so upon sound and safe principles, settled and recognized, or at least clearly within the powers and attributes of a court of equity.

What, then, are the objections urged by the defendant's counsel? They are as follows:

1. That Johnson has no *locus standi* in court. He had no title or interest in the lands which were sold for the satisfaction of the judgment. He had conveyed the lands to William H. and Clarissa Johnson, his children, in fee, for the fraudulent purpose of defeating the judgment creditor. That that conveyance, although void as against the plaintiff in execution, was valid and effectual, to all intents and purposes, in law and in equity, as against him; that if an excess of money had been

Williamson v. Adm'rs of Johnson.

raised by the sheriff on the execution, he must have paid it to William H. and Clarissa Johnson, and not to their father; and, consequently, he has no title to any of the money recovered on that judgment, even if the judgment was for more than it ought to have been. That if there was an error in the judgment, as that judgment was paid by the children, they, and not their father, were the persons who ought to have come here to get it back. That if he was now living, and the defendant was ready and willing to refund the money, he could not safely pay it to Johnson, but would be bound to pay it to his children.

The argument is plausible, but not sound. In the first place, if it was a fraudulent conveyance the children were parties to that fraud, and could have no better standing, at law or in equity, to recover back that money, than their father had. *Ergo*, the defendant may retain the excess of the judgment, and the sheriff might have retained the surplus money which arose on the sale. The statement of this result is a sufficient refutation of the argument.

Suppose a judgment clearly shown to have been obtained by fraud, or admitted to have been given by mistake, for twice as much as it ought to have been, would a court of equity refuse relief to the defendant, because he was a bad man and had conveyed away his property to defeat his creditors? Would the court say to him, you are a bad and dishonest man, and therefore we won't help you; we won't relieve you against a plain mistake, or even a judgment obtained against you by the grossest fraud? I think not.

When a man comes into court to get hold of property which, by his own fraud or injustice, has got into the hands of his adversary, or his title to which is founded in fraud or injustice, a court of equity will not hear him. It is sufficient to say this is not such a case. The maxim cited by counsel does not apply to it—a court of equity will not inquire into a man's character before it will relieve him against fraud, accident or mistake, unless by his own dishonest or unjust conduct he got himself into the difficulty he wants the court to get him out of.

But again. Whether that conveyance from Johnson to his children was a fraudulent one or not, is not a material issue in this cause. The plaintiff in the judgment got his money, and

whether the conveyance was fraudulent or not, is of no consequence to him.

Again. Whether fraudulent or not, Johnson was bound by his covenants to his children, and was responsible over to them. He conveyed the premises, whether with or without consideration, to his children, *legally subject* to that judgment, and there-- fore was legally liable over to them. Admitting, therefore, that they, as owners of the land which had been sold to satisfy the judgment, might, in the lifetime of their father, have come into equity to get back the excess; they cannot do it now, for they have recognized their father's right to the money by making themselves complainants in this suit, and have thereby estopped themselves from ever claiming the money in their own right. I am, for all these reasons, of opinion that there is nothing in this objection.

2. It is objected that the order to amend was on payment of costs and serving a copy of the amended bill gratis; that this was a condition precedent, and was never performed, so that, in fact, the defendant considered the suit as at an end, and that his counsel told him, when the Chancellor pronounced his opinion sustaining the plea and demurrer, that there was an end of the suit, and he might go home, and would never hear any more of it.

As to what his counsel may have told him, it can have no influence here. He and his solicitor and counsel were in court when the decree was pronounced; and the order for leave to amend was embodied in the very decretal order sustaining the plea and demurrer. They had notice, then, that the suit was not at an end, for the decree does not dismiss the bill out of court, but, on the contrary, in its very terms, retains it in court, with leave to the complainant to amend it. It was the duty, then, of the defendant to attend to it, and follow it up, and if the complainant did not pay the costs, amend his bill and serve a copy within a reasonable time; he should have applied to the Chancellor for a final decree dismissing the bill with costs.

As to the non-performance of the condition precedent, paying costs, &c., it was a mere irregularity, of which the party should have availed himself at the time, but he actually waived it by subsequently applying for leave to answer, and by putting in

an answer to the amended bill. Instead of doing that, he ought to have moved the Chancellor to dismiss the amended bill, on the ground that no costs had been paid and no copy served. As to the defendant's having no knowledge of the suit being still in court and of the bill having been amended, it is untrue, unless Mr. Saxton has sworn grossly and willfully false. But how can the defendant make such an assertion, when, by his own affidavit, he has admitted, and, in fact, expressly stated, that before Mr. Stockton's death he received notice to appoint another solicitor? That he afterwards as expressly denied it in his answer cannot relieve him, but serves only to weaken our confidence in other matters sworn to by him in his answer.

3. The third objection is, that the suit had abated by the death of Johnson, and the order made by Chancellor Vroom that it stand revived in the names of the present complainants was a nullity. Coupled with this exception, it was insisted that the deposition of Mr. Saxton, made after that order of revival, and before the subsequent one made by Chancellor Seely, must be ruled out, as extra-judicial, or *coram non judice,* there being no suit then depending in court.

If I am not mistaken, the deposition of Peter Williamson, if not of others on the part of the complainants, stands in the same category, and was taken under the same circumstances. But, however that may be, it is a full and complete answer to the whole of this matter, that it is too late for the defendant to complain of it. In the first place, instead of applying to the Chancellor to open the decree and be permitted to answer, and to cross-examine the witnesses, he ought to have moved the Chancellor to open the decree, and to declare the suit abated by the death of the complainant; or to set aside all the proceedings which had taken place after the death of the complainant and before the revival of the suit by the order of Chancellor Seely, as *coram non judice* and void. Secondly, the defendant must be considered as having waived this irregularity by putting in an answer to the bill, taking testimony in the cause, and cross-examining witnesses that had been sworn and examined on the part of the complainant. And thirdly, if he wanted to get rid of the deposition of Mr. Saxton, the defendant ought to have moved the Chancellor, before the cause was heard

upon the pleadings and proofs, to expunge that evidence as unduly and irregularly taken. If that had been done, the complainant might have re-examined Mr. Saxton before the hearing, and removed the difficulty. But, surely, the Chancellor did not intend, by giving the defendant leave to cross-examine the witnesses that had already been examined, to give him an opportunity of making his election among those witnesses, and then on the hearing of the cause to exclude the deposition of Mr. Saxton or of any other witness, sworn under like circumstances, that he chose not to re-examine. This would, in effect, have been to permit the defendant to play a trick on the complainant, and practice a fraud on the court.

It is said, however, by counsel, that Mr. Saxton's affidavit was a mere voluntary one, upon which no perjury could be assigned. But I am not so clear that the proposition is true. A cause was pending in court, *under the decretal order* of the Chancellor; and however irregularly so, the witness was sworn in that cause.

I am of opinion that the decree appealed from should be affirmed.

NEVIUS, WHITEHEAD, RANDOLPH and CARPENTER, Justices, and PORTER, SCHENCK, SPEER, ROBERTSON and SPENCER, Judges, concurred with the Chief Justice.

The PRESIDENT dissented. And, having prepared no written opinion at the time of the decision of the cause, has furnished the reporter with the following statement of the grounds of his dissent.

1st. The executor, in conveying to his son, in August, 1792, was guilty of a fraud. The attempted sale and conveyance have been decreed to be fraudulent and void; and the case stands as if no such conveyance had ever been made. The money, then, which it is alleged William Williamson received from Samuel Williamson, was not a part of the proceeds of a sale of the real estate, but Samuel Williamson's (he was the executor) own money. All that can be said is, that William Williamson received from Samuel Williamson money for which Samuel Williamson in his own right, not as executor, might

have maintained *assumpsit.* But his remedy was lost by lapse of time. Samuel Williamson cannot be relieved from this position unless a benefit can be permitted to result to him as executor from his fraudulent act as an individual. This cannot be permitted.

And, in point of fact, the money, if any was paid to William Williamson, was not money of the estate, but Samuel Williamson's own money, for the deed to his son was not then made, and was not made until four months thereafter. It is probable that Samuel Williamson did not feel safe in his contemplated fraud in executing a deed to his son, unless he could first induce William Williamson to receive, as on a sale represented to be consummated, his share of the consideration money of the pretended sale, in full of his share of the estate. I cannot consent, in aid of a fraud-doer, to construe such an advance of money by Samuel Williamson to be an advance of money by him as executor.

I think it more consistent with every consideration of policy, and with the firmness with which courts of equity set their faces against fraud, more especially against fraud in executors, that Samuel Williamson shall suffer the loss of the money which, in 1792, he risked in such a venture, than that William Williamson's estate or Asher Williamson should now be obliged to pay $2256, with interest thereon from October, 1843.

Twenty years elapsed from the time when the $350 is said to have been received by William Williamson from Samuel Williamson to the time when the lands of the estate were sold under the direction of a master, the Court of Chancery having so ordered in view of the fraud which had been committed or attempted by Samuel Williamson; and the proceeds of the sale were deposited in the Court of Chancery, by order of that court, and were afterwards ordered to be paid to the executor, on his giving bond, with surety, for the performance of the trust reposed in him by the will of his testator. The bond was given, with Benjamin Johnson, the present complainant, as surety, and the proceed of the sale, after certain deductions, were thereupon paid to the executor.

It seems clear to me that, neither in law nor in equity, can any allowance be made to the executor or to his surety, for

money which Samuel Williamson, twenty years before, had fraudulently and of his own money put into the hands of William Williamson.

2d. The decree in this case has been reached by allowing the executor, or Johnson as his surety, interest on the $350 fraudulently given by Samuel Williamson, in April, 1792, to William Williamson as his full share of the estate. This, also, I think erroneous. It would be oppressive and ruinous, after a great lapse of years, to charge a man with interest on money which he received as his own, and was, therefore, at liberty to spend as his own; and there is no principle on which such charge can be sustained. If my first objection to the decree could be overcome, the most that equity could require would be that what William Williamson received from Samuel Williamson should be deducted from the amount of the share which, after the fraud was exposed and remedied, was found to be actually due from the executor to William Williamson. Samuel Williamson was in possession of the lands from March, 1789, to March, 1812. All that can be required is that the $350 shall relieve the executor from the rents and profits, as far as it will go. William Williamson never agreed to receive this money in a way to charge him with interest for it, and under the circumstances of this case, no implied agreement by him to pay interest for it can be raised.

On the 2d April, 1792, William Williamson received from Samuel Williamson........................................................$350 66

Samuel had then been in possession of the lands three years and twenty days. William Williamson's fifth of the rents and profits for that time, at the annual rent fixed by master Linn, is....................................  68 75

Samuel's actual advance was only........................$281 91

At September, 1804, William Williamson's fifth of the rents and profits had repaid Samuel this $281.91.

William Williamson's share of the rents and profits, from September, 1804, to March 11th, 1812, when the executor delivered up possession, seven years and six months, is $168.75.

Williamson v. Adm'rs of Johnson.

The lands were sold, under the direction of a master, for ......... ......... ......... ................ ......... ............$7,923 31

Deduct the allowance made for improvements ...... .:......... ......... ...... ......... .........$505 00

Also the legacies, and the interest on them for twenty years, (which interest, if chargeable upon the lands at all, was a loss inflicted on those interested in the lands by the fraudulent conduct of the executor) ....... .........1,280 00

Also the account of master Linn, for superintending the sale, $173.80; also said master's commissions on the money paid into court, $69.24; (both which last items of expense grew out of the fraud of the executor,) 243 04

Deduct also the costs of the complainants in the suit in which the sale by the executor was decreed to be fraudulent, (which costs also grew out of the fraudulent conduct of the executor, and ought properly to be charged upon him, and not upon the fund,) 202 23—2,230 27

Net proceeds of the sales, after all deductions.......$5,693 04

William Williamson's fifth of this balance is.........$1,138 61

Interest on $1138.61, from March 11th, 1812, to February 27th, 1822, the date of the judgment against Johnson, 9 years, 11½ months......... ...... ......... ...... 793 67

Wm. Williamson's share of the rents, &c., as above, 168 75

Due the William Williamson share, at the time the ———— judgment was entered.......................................$2,101 03

The judgment was for $2251.78, only $150 more than the result of the above calculation. If we should strike out the allowance made in the above calculation for interest on the legacies, and the expenses of the sale under the direction of a master, and the costs of the suit in which the fraudulent sale by the executor was set aside—all which are, by reason of the fraud of the executor, more properly chargeable upon him than upon the fund—the amount due William Williamson at the time of the judgment, will be found to be nearly $100 more than the

amount for which judgment was entered. It is certainly true that all these extraordinary charges upon the fund have been induced by the fraudulent conduct of the executor; and the loss which William Williamson, or those who are entitled to his share sustain thereby, is greater than the loss which the executor or his estate would sustain by being obliged to pay the amount of the judgment recovered against his surety.

Nothing is denied to the executor in the foregoing calculation but interest on $281.91, from April, 1792, to September, 1804; a very trifling injury, for he was receiving $22.50 of the $281.91 each successive year, in William Williamson's share of the rents and profits; and interest is properly denied to him; he cannot, on any principle, be allowed interest on money which he fraudulently induced William Williamson to receive as his share of the estate, when his share was many times greater. Is the executor to be permitted to charge the estate with all the expenses, and the interest on the legacies, and the costs consequent upon his fraud and the delay induced thereby in settling the estate, and yet ask interest on the sum which he advanced for the purpose of effecting his fraudulent design? a small sum, indeed, when advanced, but which, with interest from 1792 to the time of the decree in chancery, compounded as in master Reading's report, amounted to more than the whole amount of the judgment recovered for the share of William Williamson.

The oppressive result of an affirmance of this decree, on the one hand, and the very slight injury, if any injury at all, that can be complained of on the other side, if matters are left to stand as they were placed by the judgment, are considerations which constrain me to refuse my assent to an affirmance.

I cannot imagine that any member of the court could consider the executor himself entitled to any relief. The consideration that the complainant was a surety for the executor, has, I have no doubt, influenced the mind of the court. But, if the principal has no legal or equitable defence or right, by reason of a fraud committed or attempted, prior to the time when the bond with surety was given, can the surety have any such defence or right? If the principal was not entitled to interest on the money fraudulently advanced by him, long before the bond with surety was given, can the surety be entitled to have such in-

Williamson v. Adm'rs of Johnson.

terest allowed in his favor? I think not. An executor's **giving** security after a past fraud cannot cure that fraud in favor either of the principal or of the surety. And surely the conduct of this surety has not been such as to induce us to resort to constrained reasonings, or to compound with sophisms, in his favor. This leads me,

3dly. To another objection against affirming the decree to which, as it seems to me, no satisfactory answer has been given. It is this. While the suit against Johnson was pending, and before judgment had been recovered therein, Johnson, without consideration, and for the purpose of defeating the object of the suit, conveyed all his real estate to his son and daughter. This divested him of all title to or interest in the lands, as much so as if he had received a full consideration therefor. He could not, by any proceeding on his part, recover back the land, or any part of it; nor, if a judgment was recovered against him for too much, in the suit which the conveyance was intended to defeat, and the creditor levy upon and sell the land, on the ground that the fraudulent conveyance of it did not put it beyond his reach, and the fraudulent grantees buy the land at the sheriff's sale and pay the judgment, can the fraudulent grantor have the aid of a court of equity to recover back the excess of the judgment over the true amount for which it should have been entered. To allow him to do this would be to allow him to recover a part of the proceeds of the sale of the land which he had fraudulently conveyed, and of all interest in which he had fraudulently divested himself, when he would not be allowed to recover back the land, or any part of it.

Johnson can derive no aid from the fact that his deed to his children contained a warranty against encumbrances. There was no encumbrance at the time the conveyance was made—the judgment had not then been recovered. Nor has he paid the judgment, unless a court of equity can be willing to say he has paid the judgment because he fraudulently conveyed away his property for the purpose of defeating a creditor of the end and object of his suit. I confess I am unable to yield to the course of reasoning which the Chief Justice has adopted in answer to this objection. And I am quite as unable to understand the precise meaning of the Chief Justice in saying that " He

(Johnson) conveyed the premises to his children legally subject to the judgment, and was, therefore, legally liable over to them."

I do not see that this surety can reasonably ask a court of equity to depart from settled and most salutary principles to relieve him from the effects of his own fraud. The claim of the complainant, in the most liberal view in which it can be presented, may be stated thus : A surety for an executor, believing that the executor, who was dead, had in his lifetime paid and taken a receipt for a portion of a claim existing against him, but being unable to find the receipt, makes no defence to a suit against him, the surety, but, for the purpose of defeating the creditor, before judgment is entered, fraudulently conveys all his property to his children ; judgment is afterwards entered, and execution is issued thereon, and the sum recovered is raised by a sale of the lands conveyed to the children ; the receipt is afterwards found, and it thus appears that the judgment was for too much. Will a court of equity decree to the fraudulent grantor the amount of the receipt? Suppose that after the fraudulent conveyance the receipt is discovered and the judgment is thereby prevented ; would a court of equity decree the reconveyance of the lands to the fraudulent grantor? In my judgment, an affirmative answer to either of these questions cannot be reached by sound reasoning.

Again. The decree is against *Asher Williamson*, and the amount of it is ordered to be raised out of the goods and chattels, lands and tenements, of *Asher Williamson*. The judgment was recovered by him, and the amount thereof was received by him as the administrator, &c., of William Williamson.

There was an allegation in the first bill that Asher Williamson, before he obtained letters of administration of the personal estate of William Williamson the younger, deceased, purchased from the heirs of the said William, or some of them, their claim against the executor, Samuel. If it had been shown that Asher had purchased the rights of the heirs of William Williamson, the decree, if right in other respects, might have been against Asher personally ; but no proof of such purchase appeared, and the second bill contained no such allegation.

I think the decree should be reversed.